948 A.2d 172 (2008)
400 N.J. Super. 454
DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Appellant,
v.
J.L. and T.L., Defendants-Respondents,
In the Matter of O.L., Minor.
Docket No. A-5490-06T4.
Superior Court of New Jersey, Appellate Division.
Argued April 9, 2008.
Decided June 5, 2008.
*173 Nicole LaFerriere, Deputy Attorney General, argued the cause for appellant (Anne Milgram, Attorney General, attorney; Lewis Scheindlin, Assistant Attorney General, of counsel; Ms. LaFerriere, on the brief).
Beth Anne Hahn, Designated Counsel, argued the cause for respondent J.L. (Yvonne Smith Segars, Public Defender, attorney; Ms. Hahn, on the brief).
Alton D. Kenney, Freehold, argued the cause for respondent T.L. (Lomurro, Davison, Eastman & Munoz, P.A., attorneys; Mr. Kenney, of counsel; Carrie A. Lumi, on the brief).
Christopher A. Huling, Assistant Deputy Public Defender, argued the cause for minor O.L. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Mr. Huling, on the brief).
Before Judges CUFF, LISA and SIMONELLI.
The opinion of the court was delivered by
LISA, J.A.D.
The New Jersey Division of Youth and Family Services (Division) appeals from an order dismissing its complaint for child abuse and neglect against O.L.'s mother, T.L., and father, J.L. The Division argues that the trial court's decision is against the weight of the evidence and is unsupportable because the judge misapplied the burden of proof under the child abuse law. According to the Division, once its proofs established a prima facie case of abuse, the burden of persuasion (not merely *174 the burden of going forward with evidence) shifted to J.L. and T.L., and obligated them to affirmatively prove their non-culpability by a preponderance of the evidence. The Division bases its burden-shifting argument on our decision in In re D.T., 229 N.J.Super. 509, 552 A.2d 189 (App.Div.1988).
In our view, the burden-shifting rule prescribed in D.T. is not universally applicable in child abuse and neglect cases and, in the circumstances of this case, traditional principles of res ipsa loquitur apply. As such, after the Division established a prima facie case, a burden of going forward with evidence was imposed on defendants, but the burden of persuasion remained on the Division. We conclude that the judge correctly applied the burden of proof and that her decision is well supported by the evidence. Accordingly, we affirm.
O.L. was born on December 17, 2005. Her parents were not married, but lived together in a long-term relationship. After O.L.'s birth, her parents regularly took her for wellness visits and for other medical care when it appeared to be indicated. For example, O.L. displayed signs of jaundice, and T.L. promptly took her to have her bilirubin level tested. T.L. took O.L. for a hearing test on January 3, 2006. In mid-January, after noticing a bit of orange in O.L.'s spit-up, T.L. called the doctor, who told her it was reflux and prescribed Zantac. T.L. contacted the doctor again on February 10 after O.L. projectile vomited. T.L. brought O.L. to the doctor the next day. The doctor recommended that T.L. take O.L. to Jersey Shore Medical Center (JSMC) for an ultrasound to rule out pyloric stenosis. T.L. took O.L. to JSMC for the ultrasound, and returned on February 14 for a second ultrasound. T.L. called the doctor again on February 16 after O.L. developed a cold. The doctor recommended the use of a humidifier, which T.L. purchased the same evening. At a wellness visit on February 23, the doctor prescribed Albuterol and Amoxicillin for the cold and told T.L. to switch O.L.'s diet to soy because rice was not having the desired effect for O.L.'s spitting up problem. O.L. was administered shots on February 27.
On March 14, after noticing red in O.L.'s spit-up, T.L. took O.L. to JSMC, where blood was drawn and a chest x-ray taken. Another procedure was performed in which a tube was inserted up O.L.'s nose, but T.L. left the room and did not observe the procedure at the suggestion of the medical personnel who warned that "it wouldn't be pretty." T.L. also signed a consent form for an endoscopy after questioning the doctor about the use of anesthesia on O.L. The endoscopy was performed on March 15, and it revealed "severe irritation and raw marks" in O.L.'s stomach.
While at JSMC, the doctors noticed bruises on O.L.'s right leg and decided to conduct a skeletal survey, which was performed on March 16. The results were negative. O.L. was discharged later that day with instructions to change her diet from seven to eight ounces of soy formula every three to four hours to two ounces of Alimentum every two to three hours. On March 23, after noticing blood in O.L.'s spit-up, T.L. brought O.L. to the doctor. The doctor expressed concern about O.L.'s weight and advised to add rice back into her formula. On the morning of March 27, T.L. called the doctor to inquire whether she could add prune juice to the baby's diet.
On March 27, T.L. also noticed that O.L. was holding her leg in an unusual position when she woke up. O.L. appeared irritable to T.L., who called her mother and J.L.'s mother. Both grandmothers came over. T.L. also noticed that O.L.'s leg was swollen. She immediately called her doctor *175 who advised her to come right over. She did so, and the doctor advised T.L. and the grandmothers to take O.L. to Monmouth Medical Center (MMC).
It was the results of the evaluation of O.L. at MMC on March 27, 2006 that aroused suspicion of abuse and neglect and triggered the Division's involvement. X-rays revealed that O.L. sustained multiple metaphyseal fractures to both legs, as well as a possible fracture to one rib and a possible fracture of the right distal radius. There is no dispute that the fractures to the bones of O.L.'s legs existed. T.L. suggested that the injuries could have been caused by O.L.'s "swaddler," which T.L. used to carry O.L., or by O.L. sitting in her chair and kicking the food bowl holder. J.L. suggested that O.L.'s bruises might have resulted from an incident when he rocked his chair into T.L. as she was walking by with O.L.T.L. reported that the only other people to have contact with O.L. recently were the grandmothers, T.L.'s sister, and J.L.'s friends, but that none of them were ever left alone with the baby. On the Saturday immediately preceding Monday, March 27, 2006, friends of T.L. and J.L., the Armstrongs, and their two children were over for dinner, and had access to O.L. And, on the preceding Sunday (eight days before March 27, 2006), T.L.'s mother and sister came over, and they each took turns holding O.L. and walking her.
On March 31, 2006, the Division initiated this proceeding, seeking legal and physical custody of O.L. The Division's request was granted pursuant to N.J.S.A. 9:6-8.21 to -8.73, N.J.S.A. 30:4C-12, and Rules 5:12-1 to 5:12-6. Judge Strelecki later conducted a factfinding hearing to determine whether O.L. had been abused or neglected. The hearing commenced on November 30, 2006, and spanned nine days, concluding with the judge's oral decision on April 10, 2007.
According to Dr. Sharon Underberg-Davis, a pediatric radiologist who reviewed O.L.'s x-rays at the request of the Division, O.L. suffered nine fractures that were inflicted on three separate occasions. She explained that O.L.'s chest x-ray from March 16 was "suspicious" for a left anterior rib fracture that occurred two to three weeks prior to the March 16 hospitalization. Underberg-Davis opined that O.L.'s left leg x-rays from March 16, 28, and 30 revealed four metaphyseal fractures at the distal femur, proximal tibia, distal tibia, and distal fibula that occurred between March 15 and 16. She opined that O.L.'s right leg x-rays from March 27 revealed four metaphyseal fractures at the distal femur, proximal tibia, distal tibia, and distal fibula that occurred closer to March 27. Underberg-Davis also expressed some concern about a probable fracture of the right distal radius. She opined that these fractures were "highly suspicious" of child abuse.
Underberg-Davis rejected the defense theories that the injuries could have been caused by some metabolic condition associated with O.L.'s acid reflux disease or accidentally caused during imposition of restraints used to hold O.L. in place during medical procedures she had undergone during the applicable times. When asked on cross-examination whether a lay person should have recognized O.L.'s injuries prior to the onset of swelling, she acknowledged that O.L. did not exhibit any outward signs of injury until that time. She also acknowledged that she could not conclusively determine how the injuries were caused, nor could she determine how much force was inflicted in order to cause the injuries.
When defendants learned of the fractures, they requested that O.L. be transferred *176 to Children's Hospital of Philadelphia (CHOP), which was accomplished on April 1, 2006. A treating pediatrician from CHOP, Dr. Paige Kaplan, a specialist in inherited metabolic diseases, tested O.L. for osteogenesis imperfecta, or brittle bone disease, and ruled that out as a potential cause of O.L.'s fractures. Kaplan also tested O.L.'s blood and found her calcium and phosphorus levels within normal range. She concluded there was no metabolic or genetic cause for O.L.'s injuries.
Prior to her pregnancy with O.L., T.L. was diagnosed with osteopenia. In Kaplan's view, that would have no effect on T.L.'s offspring. And, when asked about O.L.'s acid reflux disease and decreased nutrient intake, Kaplan explained that they could not have caused O.L.'s fractures because her calcium and phosphorus levels were within normal range.
The Division also presented the testimony of Dr. Lucinda Leung, another treating pediatrician at CHOP, and Dr. Mary Noble, the Division's medical consultant on potential child abuse cases. Leung and Noble opined that O.L.'s fractures were "highly suggestive of inflicted injury" and "consistent with non-accidental trauma."
In addition to the medical testimony we have outlined, Noble and a Division caseworker also described in their response report the results of their interview with J.L. at the initiation of the Division's involvement. They described him as anxious, fidgety, and acting in an inappropriate manner. J.L. acknowledged that he had an alcohol problem in the past, but was now attending AA meetings daily. He also reported he had been sentenced to seven years imprisonment after an incident involving a motorcycle accident involving alcohol use on his part. J.L. admitted that he had been alone with the baby on the Thursday prior to his interview date of Tuesday, March 28, 2006.
Toward the close of the Division's case, the judge granted defendants' motion to dismiss the medical neglect aspect of the case because there was no evidence to suggest that either parent failed to seek medical care for their daughter's injuries. When the Division rested, however, the judge denied defendants' motion to dismiss the abuse aspect of the case. She found that the Division made out a prima facie case of abuse based upon circumstantial evidence, and that defendants would be required "to move forward with regard to the issue before the Court." The judge then said:
And I'm satisfied, going through the facts that are before [me] that the parents were the care givers, the primary care givers for the child during the time lines that were involved here and that thethey have established that the injuries in question were not accidental. And, therefore, I believe there is sufficient [evidence] to require the defendants to move forward.
However, the Court will revisit this, obviously, with regard to the issue of abuse, at the conclusion of all of the factual evidence.
Defendants each presented several character witnesses, who attested to their good traits of dependability, reliability, truthfulness, and the like. They each also presented a psychologist. Mark White, Ph.D., a clinical psychologist, performed a psychological risk assessment on T.L. He reported the results of various tests he administered and reported that T.L. "was exceedingly frank" and "was far below the cutoff for even the most liberal predictor of child abuse by this test that was specifically designed for that purpose." He found "no indices of any psychopathology" and "no personality disorder signs" in T.L. Based on the four clinical tests he performed and his interview with T.L., White *177 opined that T.L. is not capable of inflicting an injury upon her daughter or allowing someone else to do so.
J.L. presented the testimony of Dr. Thomas Mackarevich, who performed a psychosocial evaluation and risk assessment of J.L. Macharevich's conclusion was that J.L. was not at risk for abusing his daughter. However, we will not go into detail about his findings and opinions because the judge totally discredited his testimony for various reasons upon which we need not elaborate.
Both defendants testified. Both denied any abuse of their daughter. By the time the factfinding hearing began on November 30, 2006, J.L. and T.L. had ended their relationship and were no longer living together. O.L. had been living with family friends Robert and Karen Armstrong. On December 15, 2006, O.L. was returned to her mother's care. T.L. testified on January 10, 2007. She said: "[O.L.] is thriving. [She] is 24 plus pounds which is quite big back in the 95th percentile. She doesn't just walk, she runs around. She says, has an incredible vocabulary for, you know, her age. [She] is just full of personality and is perfect, sleeps through the night still." J.L. also testified on January 10, 2007. He said: "I see [O.L.] three time a week at my friend Rob's house, Robert Armstrong and Karen Armstrong's home and like I said she'syou know, I absolutely adore her. She's the love of my life and it's the highlight of my life, you know, and of my every day that I see her it's a real highlight. It keeps me going." Robert Armstrong confirmed that J.L. visits O.L. "every chance he gets" and that J.L. is a "caring father."
J.L. testified that he loved his daughter and would not do anything to hurt her and would not jeopardize his relationship with her and take the risk of losing her in order to protect someone else. He could not provide the court with a reason for O.L.'s fractures, but insisted he was not the cause. He explained that both he and T.L. were O.L.'s primary caregivers and there were times when he was alone with her.
J.L. described the events of March 27, when O.L. was taken to MMC and x-rayed. He said the x-ray technician twisted O.L.'s legs to obtain different views. At the time, J.L. expressed his concern that the technician was hurting his daughter, and she allowed him to take over in holding O.L.'s legs.
J.L. described the circumstances under which he and T.L. mutually ended their eighteen-year relationship in late spring or early summer of 2006. He said: "[M]e and [T.L.] were a couple and when we had [O.L.], you know, we were a family, you know, and once [O.L.] was taken away, you know, the absolute horror of the situation of having our child removed that there was just no room for our relationship. . . ."
T.L. provided her social and educational background, which includes a degree in law and justice from Trenton State College (now the College of New Jersey). She worked at a hospital and at a law firm before joining Merrill Lynch, where she was then employed for eight-and-one-half years. Upon her father's death, she helped support her mother. Her pregnancy with O.L. was planned, and she received full prenatal care to ensure a healthy pregnancy.
T.L. described in detail the medical care she obtained for O.L. during the first three months of O.L.'s life, which we have previously outlined. She was "shocked" by the discovery of the fractures at MMC on Monday, March 27, 2006. She researched what might have caused the fractures and learned about osteogenesis imperfecta. She called CHOP's metabolic clinic, discussed with them O.L.'s injuries, and requested *178 that O.L. be transferred there for further evaluation. After O.L. was admitted to CHOP, T.L. drove to JSMC to pick up O.L.'s x-rays for evaluation by CHOP physicians.
T.L. insisted she did not know how these fractures occurred and she would not have let her daughter go to foster care to protect another individual, including J.L.
Defendants produced the testimony of Dr. Janice J. Ophoven, a forensic pathologist. Ophoven reviewed x-rays and medical records from MMC and CHOP, past medical history, and child protection investigatory materials. She noted that T.L. had a history of osteopenia:
The issue in this case is that mom has an unusual finding for a young woman, which is that she has weak bones, had weak bones to start with. She had osteopenia beforebefore this pregnancy took place. Which means that there is something awry with her bone metabolism to start with. So is there reason to believe that there might have been something wrong with bone and mineral exchange between mom and baby in this case? The answer is, there is something wrong. I can't say specific cause and effect, I am not just going, hmm, this is unusual, we got a mom with thin bones and we have baby with maybe fragile bones.
Ophoven acknowledged, however, that there was no evidence of intrauterine deficiencies in T.L.
Ophoven further noted that T.L.'s mother had a history of osteoporosis with early onset:
The maternal grandmother is, at a young age, also suffering from weak bones. So thethere is some question as to whether or not this family, this legacy of genetics is normal in terms of bone integrity and strength. And the thing that you look for, just like we look for osteogenesis imperfecta or we look at other things is, is there anything wrong with the bone heredity in this family, and the answer is, yes.
She also found significant O.L.'s history of recurrent vomiting and problems with weight gain:
[R]egardless of the cause of the vomiting, the baby is not receiving and keeping down sufficient calories to grow normally. And there was concern raised about her growth and her weight maintenance, and clearly, if we already have a potential problem with bone physiology and mineral access and then we add on top of that significant nutritional set backs and vomiting, then we are really talking about a baby who might be on the brink of having problems with bone problems.
Ophoven added that the drugs O.L. received to control her acid reflux are "known to impair bone metabolism" in that they interfere with the acid content of the stomach, the absorption of vitamin D, the absorption of calcium, and normal nutritional metabolism.
These circumstances led Ophoven to the conclusion that O.L. may have suffered from weak bones, which additional medical testing did not rule out:
You can do a bone density test in grownups and you can say okay this looks normal or this doesn't look normal. There is no bone density test for babies so we can't do a test that says this baby has normal bones or not. Nobody has done a test on [O.L.] that says she has normal bones or not.
She added that "calcium and potassium levels are not a measure of bone function, metabolism, or strength."
Ophoven further testified that a child with weak bones is particularly vulnerable *179 to injury in the hospital. She noted that in any procedure done on a three-month-old, such as an x-ray or an endoscopy, the child has to be restrained. Ophoven stated, "it is well reported in literature that even benign medical care in the form of manipulation in a child with an otherwise weak bone can cause subtle fractures." She explained that in this case "there was witness restraint taking place at or around the time that this child probably suffered thesome of her fractures, which to me means that they may not have occurred at her household."
As to the particular injuries in this case, Ophoven further testified that O.L.'s leg fractures occurred in an area known as the growth plate, which she described as "little, tiny, tiny, microscopic fingers of cartilage that extends down into the bone." There are no studies that reveal what kind of force is necessary to cause these fractures. Ophoven opined that such injuries could be sustained if a person were to flip a baby over from back to stomach using a leg or both legs.
Ophoven explained that infants between the ages of two and four months often develop these kinds of fractures. These fractures do not impair function, nor do they require intervention or surgical treatment. After the age of four months, the bones become more resilient. Thus, the fact that O.L. did not sustain additional fractures while in foster care is not proof that O.L. was the victim of child abuse.
Given the case history, Ophoven concluded that there was no way to conclude to a reasonable degree of medical certainty that the cause of O.L.'s injuries was inflicted or intentional trauma. However, she could not say that the injuries were not the result of child abuse.
The judge credited T.L.'s testimony regarding the medical care she provided to O.L. from the time O.L. was born to the time she was admitted to MMC. In evaluating the testimony of the medical experts, the judge was particularly impressed with and gave the greatest weight to the testimony of Underberg-Davis and Ophoven. She quickly referenced the findings of Leung, Noble and Kaplan, giving no weight to Noble's findings. She briefly referenced White's testimony and, as we have stated, completely rejected that of Mackarevich. Noting the divergence of opinions by the experts, the judge ultimately accepted Ophoven's conclusion that "the diagnosis of abuse and neglect of [O.L.] cannot be confirmed to any certainty." In doing so, she noted Underberg-Davis's testimony that she had no way of determining whether the injuries were intentionally inflicted or accidentally inflicted.
Regarding the burden of proof, the judge reiterated that at the end of the Division's case she "granted the Division's motion to shift the burden to the parents in order for them to show that they did not cause the child's injuries." However, in the course of rendering her findings and conclusions, it is not so clear that the judge held defendants to an obligation to affirmatively prove that they did not cause the injuries. On the contrary, it appears that the judge allowed the burden of proof to remain on the Division and concluded that the Division did not prove by a preponderance of the evidence that either parent abused O.L. The judge said:
[Dr. Ophoven] really presents a very, very compelling argument to indicate that we should be very careful before we charge a parent with abuse. And that, in this particular case, she did not believe that, while some of the doctors may have indicated that they did examine some of the areas that she relied on to make her full diagnosis and then render her opinion, that sufficient [evidence] *180 was not looked into in order to determine that this was not a case where we could say that this was clearly a child abuse case. Well, I shouldn't say clearly a child abuse case. She said in her opinion, the diagnosis of abuse and neglect of [O.L.] cannot be confirmed to any degree of certainty.
And I find that to be true. I do not believe that I have before me a basis which would allow this Court to find abuse and neglect. And, of course, I shouldn't put it that way. I should say that we're not going to be sitting here looking to see that people are guilty. We're looking here to everybody [to] provide us with all the information that they have and then see where it leads us. And I believe that the information that this Court has, the facts that I have found by a preponderance of the evidence do not show that there was child abuse as defined by the New Jersey statute.
. . . .
It was important to the Court to put on the record what, you know, not just what the parents had done with regard to caring for the child, but also the fact that there were any number of people who had access to this child from the date that the child was born to the date that these fractures were discovered, you know, including technicians and including other people. The Armstrongs were there on that one evening with their children. And so, consequently, this is not what I consider to be a res ips[a] loquitur where the thing speaks for itself because there are only a limited number of people who had access to the child nor was it clear from the testimony before me the dates that the different fractures occurred.
Under N.J.S.A. 9:6-8.21c(1), an abused or neglected child is defined as:
a child less than 18 years of age whose parent or guardian . . . inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ. . . .
In an action against a parent or guardian for abuse or neglect, the court will conduct a factfinding hearing to determine whether the child is abused or neglected. N.J.S.A. 9:6-8.44. In child abuse or neglect hearings,
proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child. . . .
[N.J.S.A. 9:6-8.46a(2).]
In a factfinding hearing,
(1) any determination that the child is an abused or neglected child must be based on a preponderance of the evidence and (2) only competent, material and relevant evidence may be admitted.
[N.J.S.A. 9:6-8.46b.]
The issue in this case is whether the burden of proof shifted to the parents to prove their non-culpability once the Division established a prima facie case of child abuse under N.J.S.A. 9:6-8.46a(2).
In their appellate briefs, T.L. and J.T. contend that Judge Strelecki shifted the burden of proof to them as prescribed by D.T. and found that each of them carried their burden of affirmatively proving by a preponderance of the evidence that they did not cause the fractures. They say *181 they did so through their own testimony and the testimony of their fact and expert witnesses. The Division contends that although the judge said she shifted the burden of proof to the parents, she in fact held the Division to the burden of proof and ultimately found that the Division failed to prove by a preponderance of the evidence that the parents abused O.L. In this, the Division says the judge erred. The law guardian agrees with the Division's contention that the judge held the Division to the burden of proof. However, the law guardian argues that the judge was correct in doing so and that the judge's findings that, considering the totality of the evidence, the Division failed to carry its burden of proving by a preponderance of the evidence that either parent abused O.L. and caused the fractures is supported by the evidence and should be sustained. We agree with the law guardian.
In D.T., the majority of the panel, applying the rule of Anderson v. Somberg, 67 N.J. 291, 298-99, 338 A.2d 1, cert. denied, 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975), held:
[Where] a limited number of persons, each having access or custody of a baby during the time frame when a sexual abuse concededly occurred, no one else having such contact and the baby being then and now helpless to identify her abuser, . . . [t]he burden would then be shifted, and such defendants would be required to come forward and give their evidence to establish nonculpability.
[Supra, 229 N.J.Super. at 517, 552 A.2d 189 (emphasis added).]
The criteria for application of the Anderson v. Somberg burden-shifting, paradigm, otherwise known as conditional res ipsa loquitur, requires that a defined number of people have access to the child at the time the abuse definitively occurred.
We applied the D.T. standard in New Jersey Division of Youth and Family Services v. S.S., 275 N.J.Super. 173, 181, 645 A.2d 1213 (App.Div.1994), which required the mother and her paramour to prove their non-culpability after the Division established a prima facie case of abuse. However, the applicability of the burden-shifting rule of D.T. was not disputed in that case. Instead, the mother argued on appeal that the burden-shifting requirement of D.T. violated her Fifth Amendment privilege against self-incrimination. Id. at 178, 645 A.2d 1213. Referencing New York case law interpreting that state's virtually identical child abuse and neglect law, we rejected the mother's Fifth Amendment argument, and held that the privilege against self-incrimination is not violated "by requiring certain defendants to demonstrate their non-culpability in the found abuse of a child in their custody." Id. at 179-81, 645 A.2d 1213 (emphasis added).[1]
Here, unlike in D.T., the circumstances do not fit the Anderson v. Somberg burden-shifting paradigm. By the Division's own evidence, the fractures occurred at three different times over a period of several weeks. The parents were not the only individuals with access to O.L. during these times. Nor were the extended family, including the two grandmothers or other relatives and friends who visited. Indeed, *182 O.L. was in the custody of medical personnel on various occasions and subjected to various procedures, including x-rays and endoscopy, which required physical restraint.
In a case such as this, where the child is exposed to a number of unidentified individuals over a period of time, and it is unclear as to exactly where and when the child's injuries took place, traditional res ipsa loquitur principles apply. This means that once the Division establishes a prima facie case of abuse or neglect under N.J.S.A. 9:6-8.46a(2), the burden will shift to the parents to come forward with evidence to rebut the presumption of abuse or neglect. Unlike the rule set forth in D.T., the burden of proof will not shift to the parents to prove their non-culpability by a preponderance of the evidence. The burden of proof will remain on the Division.
Our conclusion is bolstered by reference to the interpretation given by New York courts to the similar statutory language in that state's abuse and neglect law. See N.J.S.A. 9:6-8.46; N.Y. Fam. Ct. Act § 1046.[2] New Jersey courts have often looked to New York case law for guidance in child abuse and neglect cases. See, e.g., G.S. v. Dep't of Human Servs., 157 N.J. 161, 180-81, 723 A.2d 612 (1999) (referencing New York case law interpreting similar statutory language in support of its holding that a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child); In re Maraziti, 233 N.J.Super. 488, 493-94, 559 A.2d 447 (App.Div.1989) (citing New York case law for the proposition that a law guardian occupies an attorney-client relationship with an alleged abused or neglected child).
The New York Court of Appeals explained that the New York statute is fault based and requires the Department of Social Services to establish its case by a preponderance of the evidence. In re Philip M., 82 N.Y.2d 238, 604 N.Y.S.2d 40, 624 N.E.2d 168, 172 (1993). The court noted that the statutory scheme "authorizes a method of proof which is closely analogous to the negligence rule of res ipsa loquitur" and is indeed "modeled on the res ipsa loquitur doctrine." Ibid. Therefore:
As in negligence cases tried on the theory of res ipsa loquitur, once a petitioner in a child abuse case has established a prima facie case, the burden of going forward shifts to respondents to rebut the evidence of parental culpability. But contrary to the statement of the Appellate Division, the burden of proving child abuse always rests with the petitioner; [s]hifting the burden of explanation or going forward with the case does not shift the burden of proof. It is sometimes said that once a prima facie case is established a presumption of parental responsibility for child sexual *183 abuse arises but this refers to a presumption which is evidentiary and rebuttable whether by [respondent's] own testimony or by any other evidence in this case. While the fact finder may find respondents accountable for sexually abusing a child or allowing sexual abuse to occur after a prima facie case is established, it is never required to do so.
. . . .
Section 1046(a)(ii) of the Family Court Act attempts to strike a fair and reasonable balance between a parent's right to care for a child and the child's right to be free from harm. The establishment of a prima facie case does not require the court to find that the parents were culpable; it merely establishes a rebuttable presumption of parental culpability which the court may or may not accept based upon all the evidence in the record. Before relying upon its provisions, the court should consider such factors as the strength of the prima facie case and the credibility of the witnesses testifying in support of it, the nature of the injury, the age of the child, relevant medical or scientific evidence and the reasonableness of the caretaker's explanation in light of all the circumstances. In weighing the caretaker's explanation, the court may consider the inferences reasonably drawn from his or her actions upon learning of the injury. Certainly, the caretaker's failure to offer any explanation for the child's injuries, to treat the child, or to show how future injury could be prevented are factors to be considered by the court, for they reflect not only the caretaker's fault and competence but also the strength of the caretaker's rebuttal evidence.
[Id. at 172-73 (emphasis added) (citations and internal quotation marks omitted).]
This traditional res ipsa loquitur approach represents the correct interpretation of N.J.S.A. 9:6-8.46a(2) as applied to the facts in this case. Such an approach is consistent with our tort law:
Res ipsa loquitur does not shift the burden of proof or the burden of persuasion. It merely confers on plaintiff an inference of negligence necessary to establish a prima facie case, thereby requiring defendant to go forward and explain the causative circumstances because of defendant's superior knowledge. It does not require defendant to present exculpatory evidence.
By contrast, the doctrine recognized in Anderson, supra, 67 N.J. at 291, 338 A.2d 1, does shift the burden of proof to defendants, requiring them to exonerate themselves from liability. The doctrine is one of "alternative liability," which is limited to medical malpractice cases in which plaintiff is "clearly helpless or anesthetized," the injury bespeaks negligence, and all potential defendants in the chain of events causing plaintiff's injuries are before the court and represented.
[Rocco v. N.J. Transit Rail Operations, Inc., 330 N.J.Super. 320, 340, 749 A.2d 868 (App.Div.2000) (citations omitted).]
This approach is appropriate in cases where the parents, whose child was exposed to a number of unidentified individuals over a period of time, and where the timing of the injuries is uncertain, may not ever be able to prove how the injuries occurred. See D.T., supra, 229 N.J.Super. at 519, 552 A.2d 189 (Shebell, J.A.D., concurring in part, dissenting in part) ("[The majority's] solution to the present dilemma of shifting the burden to the parents might unjustly serve to place guilt upon a parent for the heinous offense of sexual abuse merely because of the parent's inability to prove innocence.").
*184 Under this approach, parents are not obligated to present evidence. They may choose to rest and allow the court to decide the case on the strength of the Division's evidence. Philip M., supra, 604 N.Y.S.2d 40, 624 N.E.2d at 172. They may present evidence tending to refute the Division's prima facie case by showing, for example, that the child was not in their care when the injury occurred or that the injury could reasonably have occurred accidentally, with or without any acts or omissions on their part. Ibid. That is the nature of the proofs the defendants presented here.
We find no error in the trial judge's finding that the inference of abuse resulting from the Division's establishment of a prima facie case under N.J.S.A. 9:6-8.46a(2) was successfully overcome by the evidence presented by defendants. As Ophoven explained, and the judge found credible and persuasive, the extremely fragile growth plates, which are most vulnerable when a baby is two to four months old, can easily sustain mild fractures with minimal force, and such fractures have been known to occur during medical procedures. These fractures were not even detected on the skeletal x-ray performed at JSMC. Yet, Underberg-Davis opined that some of them occurred prior to that study. Ophoven also explained that metabolic and nutritional forces were at work, including the mother's and maternal grandmother's history of osteopenia and osteoporosis, which well could have made O.L.'s bones, particularly at the metaphysis, particularly weak and vulnerable at this stage of her life.
These were tiny fractures, hardly perceptible on the x-ray studies, that will not result in any permanent disability. We mention this not to minimize the significance of the fractures, but as relevant to the weakness of the bones (as opined by Ophoven and believed by the fact finder) and the minimal force that could cause such fractures. Ophoven explained, for example, that in addition to the medical procedures, such benign and routine physical activities as flipping a baby over from her back to her stomach, using a leg or both legs, could easily cause such injuries.
The judge's factual findings were well supported by the evidence, and we defer to those findings. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605, 926 A.2d 320 (2007); Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998); Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974).
Affirmed.
NOTES
[1] In New Jersey Division of Youth and Family Services v. A.C., 389 N.J.Super. 97, 114, 911 A.2d 104 (Ch.Div.2006), although the court purportedly applied the D.T. burden-shifting standard, it apparently held the Division to the burden of proof in holding that the Division submitted prima facie proof of abuse and A.C. "has not rebutted the Division's prima facie case," as a result of which the Division "satisfied its burden of proof by a preponderance of the evidence."
[2] Section 1046 provides:

(a) In any hearing under this article
. . . .
(ii) proof of injuries sustained by a child or of the condition of a child such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent or other person legally responsible. . . .
. . . .
(b) In a fact-finding hearing:
(i) any determination that the child is an abused or neglected child must be based on a preponderance of evidence;
. . . .
(iii) except as otherwise provided by this article, only competent, material and relevant evidence may be admitted.