# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0437-16T1
A-0438-16T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.C. and I.C.,

      Defendants-Appellants.

_____

IN THE MATTER OF JE.C., IS.C.
and A.F.C.,

      Minors.

_____

Argued October 12, 2017 — Decided October 24, 2017

Before Judges Haas, Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0387-11.

Christine Olexa Saginor, Designated Counsel, argued the cause for appellant J.C. (Joseph E. Krakora, Public Defender, attorney; Ms. Saginor, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant I.C. (Ryan T. Clark, Designated Counsel, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Ms. Colonna, on the brief).

Margo E. K. Hirsch, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Ms. Hirsch, on the brief).

PER CURIAM

Defendant J.C.[1] appeals from the Family Part's July 25, 2012 order, following a fact-finding hearing, determining that she abused or neglected her four-month-old daughter, Isabella, by failing to protect the infant by allowing her husband, defendant I.C., to be a caretaker for the child despite his known mental health and anger issues. J.C. and I.C.[2] both appeal the court's June 29, 2015 order, following a separate fact-finding hearing, determining that they abused or neglected another infant child,

---

[1] We use initials and fictitious names to protect the privacy of the family.

[2] Shortly before oral argument on these consolidated appeals, I.C.'s attorney advised us that his client had passed away and, therefore, the attorney would not be attending the argument. Despite the apparent mootness of the issues I.C. raised in his appeal, and in the absence of a formal withdrawal of I.C.'s appeal by his attorney, we have determined to address I.C.'s claims.

Alexa, by hiding the child from the Division of Child Protection and Permanency following her birth and then having unsupervised contact with the baby prior to the completion of court-ordered services while they were both restricted to supervised visitation with their other children.[3]

Defendants challenge the trial court's finding that their conduct constituted abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b). The Law Guardian supports the court's finding that the Division met its burden of proving abuse or neglect of the two children by a preponderance of the evidence. Based upon our review of the record and applicable law, we affirm.

When the Division first became involved with this family, defendants had two children, Julie, born in December 2009, and Isabella, born in November 2010. In March 2011, when Isabella was four months old, the Division learned that defendants had brought the infant to a hospital for evaluation because her head was enlarged. Testing revealed that the baby had bilateral subdural hematomas, bilateral retinal hemorrhages, and bilateral mid-clavicle fractures, as well as several rib fractures. Isabella also had burns on her abdomen and thigh.

---

[3] The July 25, 2012 and June 29, 2015 orders became appealable as of right after the trial court entered a final order on August 18, 2016, dismissing the litigation.

The Division's experts evaluated Isabella and her medical records and opined that the baby's injuries were consistent with physical abuse and abusive head trauma and likely occurred as separate incidents over a period of time within five days and three weeks of defendants taking the child to the hospital. With the approval of the court, the Division removed Isabella and Julie from defendants' care and custody and placed the children in resource homes.

When questioned by investigators, I.C. and J.C. denied harming the baby. Both parents stated that I.C. cared for the child while J.C. was at work. Both speculated that Isabella may have been injured when Julie slipped and fell on the child in January 2011. When confronted by hospital staff, I.C. suggested that the child may have been injured in a car accident. I.C. also stated that Isabella's ribs may have been broken because he held the baby in "a certain way."

With regard to the burns on the infant's body, I.C. stated that he put a steak knife that he had just washed with very hot water near Isabella while he left to go to the bathroom, and the child accidentally rolled over on it. However, the Division's expert determined that the burns were not in the shape of a knife and were not consistent with I.C.'s account.

4

I.C. stated that he had post-traumatic stress disorder, but he had stopped taking his medication. J.C. was aware of her husband's mental health issues. J.C. admitted that I.C. was paranoid, easily became upset over minor matters, and would throw things when angry. At one point, he had attempted suicide. Nevertheless, J.C. continued to leave Isabella in I.C.'s care, even after he told her how the child had allegedly been burned.

Defendants' experts testified that Isabella had underlying medical conditions, such as vitamin deficiencies and blood disorders, which caused her injuries. After the Division placed Isabella in a resource home, however, she suffered no further fractures and her subdural hematomas improved without any additional vitamin supplements.

In a thorough oral opinion, Judge Elaine Davis found that the Division's experts were more credible and that J.C. and I.C. abused or neglected the baby because she suffered serious non-accidental injuries while in their care. Although the precise culpability of each parent in inflicting these injuries could not be determined, the judge found it likely that I.C. caused them. The judge further found that J.C. placed the children in harm's way by leaving them home alone with I.C. even though she was aware of her husband's mental health problems.

After the hearing, Isabella and Julie remained in the Division's care and custody. The trial court barred J.C. and I.C. from having any unsupervised contact with the children and ordered them to complete a number of services, including psychological evaluations and psychotherapy, as a condition to regaining custody. The court also ordered I.C. to participate in anger management and parenting skills classes.

In April 2012, J.C. gave birth to the couple's third child, Alexa. Defendants did not disclose J.C.'s pregnancy or Alexa's birth to the Division or the court.

In April 2013, the Division received a referral that a one-year-old child was living with J.C. When questioned by the Division, J.C. denied that she was caring for a baby.

Because J.C. had complied with the services ordered by the court, the Division reunited her with Isabella and Julie on July 22, 2013. That same day, however, the Division received another referral that a third child was living with J.C. When questioned by a Division caseworker whether she was hiding a baby in her home, J.C. replied, "I don't know." However, she soon confessed that she had given birth to Alexa in April 2012 and had concealed this fact from the Division. J.C. further admitted that she did not disclose this child to the Division or the court because she

knew the Division would have taken custody of the child until she completed services.

J.C. stated that after Alexa was born, the infant lived with J.C.'s grandmother. After the Division asked J.C. in April 2013 whether a baby was living with her, J.C. stated that she and I.C. placed Isabella with family friends. The friends confirmed that Alexa had been in their care since April 2013. They stated that several times a month, J.C. and I.C would have unsupervised access to the child and that J.C. frequently took the baby home with her on weekends and that I.C. would accompany J.C. when she returned Alexa to them.

J.C. later told investigators that I.C. had lived with her until February 2013 and then moved in with his mother for a couple of months before his conviction. She admitted that I.C. was in the home when she brought Alexa there. As a result of these disclosures, the Division substantiated J.C. and I.C. for abuse or neglect of Alexa.[4]

Following a fact-finding hearing, Judge Mark Nelson rendered a comprehensive oral decision, finding that J.C. and I.C. abused or neglected Alexa by having the child in their unsupervised

---

[4] On September 26, 2013, I.C. was convicted of a number of charges stemming from the injuries to Isabella, including endangering the welfare of a child and aggravated assault.

A-0437-16T1

custody at a time when they had not yet completed the services necessary for them to safely care for children, thus placing the baby at a substantial risk of harm.

On appeal, J.C. challenges the July 25, 2012 order that found she abused or neglected Isabella by continuing to allow I.C. to care for the child even after he burned her and the baby's head began to swell. J.C. argues that the judge's finding is "not supported by substantial credible evidence" and that the Division "failed to prove by a preponderance of the evidence that [she] was aware that her children were exposed to a substantial risk of harm due to I.C.'s mental health issues."[5] We disagree.

Our review of the trial judge's factual finding of abuse or neglect is limited; we defer to the court's determinations "'when supported by adequate, substantial, credible evidence.'" N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 89 (App. Div. 2008) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). The trial court is best suited to assess credibility, weigh testimony and develop a feel for the case, and we extend special deference to the Family Part's expertise. N.J. Div. of

---

[5] J.C. also argues that "the trial court improperly shifted the burden of proof to J.C." pursuant to In re D.T., 229 N.J. Super. 509 (App. Div. 1988). We have considered this contention in light of the record and applicable legal principles and conclude it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

<u>Youth & Family Servs. v. M.C. III</u>, 201 <u>N.J.</u> 328, 342-43 (2010); <u>Cesare</u>, <u>supra</u>, 154 <u>N.J.</u> at 413.

Unless the trial judge's factual findings are "so wide of the mark that a mistake must have been made" they should not be disturbed, even if we would not have made the same decision if we had heard the case in the first instance. <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 <u>N.J.</u> 261, 279 (2007) (internal quotation marks and citation omitted). "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support" the judge's decision. <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 <u>N.J.</u> 420, 448-49 (2012).

In pertinent part, <u>N.J.S.A.</u> 9:6-8.21(c)(4)(b) defines an "abused or neglected child" as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

A court does not have to wait until a child is actually harmed or neglected before it can act in the welfare of that minor. <u>N.J.</u>

Div. of Youth & Family Servs. v. V.M., 408 N.J. Super. 222, 235-36 (App. Div.) (citing In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)), certif. denied, 200 N.J. 505 (2009), cert. denied, 561 U.S. 1028, 130 S. Ct. 3502, 177 L. Ed. 2d 1095 (2010). Thus, "[i]n the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm." N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 23 (2013) (citing N.J.S.A. 9:6-8.21(c)(4)(b)). Nor does harm to the child need to be intentional in order to substantiate a finding of abuse or neglect. M.C. III, supra, 201 N.J. at 344.

In determining a case of abuse or neglect, the court should base its determination on the totality of the circumstances. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). A finding of abuse or neglect must be based on a preponderance of the evidence. N.J.S.A. 9:6-8.46(b).

Applying these standards to this matter, we are satisfied there was competent, credible evidence in the record to support Judge Davis's finding that defendant abused or neglected Isabella by continuing to permit I.C. to care for the child. J.C. knew that her husband suffered from mental health issues. She also knew that he had stopped taking his medication and was easily upset. When she came home to find that Isabella had been burned, she did not question I.C.'s implausible story that the two-month-

10

old baby had accidently rolled over on a hot steak knife. Instead, she kept leaving the infant with I.C. As a result, the baby suffered multiple injuries over a three-week period, including burns, multiple fractures, subdural hematomas, and bilateral retinal hemorrhages.

Under the totality of these circumstances, we discern no basis for disturbing Judge Davis's determination that J.C.'s disregard for Isabella's safety placed the baby at risk of serious harm and constituted abuse and neglect within the meaning of N.J.S.A. 9:6-8.21(c)(4). Therefore, we affirm the July 25, 2012 order.

Both defendants contest Judge Nelson's June 29, 2015 determination that they abused or neglected Alexa by hiding the child from the Division following her birth and then having unsupervised contact with the baby prior to the completion of court-ordered services. J.C. argues that the judge's finding "is not supported by substantial credible evidence." I.C. asserts that "the competent evidence did not establish that [he] was grossly negligent or reckless in not notifying the Division that J.C. gave birth to [Alexa], when he was not subject to a case plan or court order directing him to do so." These contentions lack merit.

A-0437-16T1

As discussed above, Isabella suffered extensive injuries while in defendants' care. As a result, the trial court granted custody of Isabella and Julie to the Division and barred defendants from having any unsupervised contact with the children. The court also ordered defendants to participate in a number of different services designed to address the issues that caused them to place their first two children in harm's way. The import of this directive was clear: neither defendant could safely care for an infant unless and until they completed the required services.

In spite of the court's order, J.C. and I.C. deliberately hid J.C.'s pregnancy and Alexa's birth from the Division because they were aware that the Division would have emergently removed her and placed her in foster care with her siblings in order to protect her from the danger posed by her parents, who had still not completed services. Defendants then had unsupervised and unfettered contact with the new baby for several months before their subterfuge was finally discovered.

Under these circumstances, Judge Nelson appropriately concluded that both defendants placed Alexa in substantial risk of harm within the intendment of N.J.S.A. 9:6-8.21(c)(4). Therefore, we also affirm the June 29, 2015 order.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0437-16T1