# **RECORD IMPOUNDED**

### **NOT FOR PUBLICATION WITHOUT THE**
### **APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4740-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

A.Z.,

      Defendant-Appellant,

and

J.C.B. and J.S.,

      Defendants.

_____

IN THE MATTER OF C.B. and
C.Z., minors.

_____

Submitted December 2, 2019 – Decided  September 10, 2020

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0463-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Beth Anne Hahn, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Amanda L. Helms, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Neha Gogate, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant A.Z. (Alma[1]) appeals from a January 27, 2017 Family Part order finding she abused or neglected her then seven-month-old daughter, C.B. (Carla). She argues the trial judge improperly shifted the burden to her to disprove culpability, and that the judge's abuse or neglect finding was based on insufficient evidence. We disagree and affirm.

The Division received a referral conveying concerns that Carla was abused, after Alma brought her to the hospital. According to hospital notes,

---

[1] In accord with Rule 1:38-3 and for the reader's convenience, we use pseudonyms for the parties.

Alma had noticed bruising on Carla's right arm that morning, and by the afternoon, swelling appeared. Alma initially could not explain what caused the injury.[2] X-rays revealed Carla had a displaced transcondylar fracture in her right elbow. She underwent surgery the following day.

In an interview with the Division's Special Response Unit (SPRU) caseworker the day of the surgery, Alma admitted she was Carla's primary caretaker, and that her boyfriend, with whom she lived, had no contact with the child the previous day. He worked until 11:00 p.m. Alma told the caseworker she gave Carla a bath at 9:00 p.m. the previous night and put her to bed. She observed nothing unusual then, or when she woke to feed Carla overnight.

At Carla's 10:00 a.m. bath, Alma noticed that the child's right arm was bruised. The left arm was bruised too. When she raised the child's right arm to wash, Carla cried in pain. Alma first took Carla to her pediatrician, but they were turned away because they did not have an appointment. After the arm worsened during the day, she brought the child to Overlook. She told the caseworker Carla was with her all that day and the day before. She denied Carla fell or was harmed. Based on the interviews, the Division determined that an

---

[2] Alma does not speak English and communicated with the hospital staff and Division caseworkers with the assistance of Spanish-speaking staff members.

A-4740-17T4

emergency removal was necessary because Alma could not plausibly explain how C.B. suffered the injury.

At the subsequent fact-finding hearing, the Division presented testimony from SPRU caseworker Santiago Gonzalez; permanency supervisor Inez Perez-Nin; and pediatric care expert Dr. Raksha Gajarawala. Gonzalez recounted aspects of the Division's investigation. The court admitted the Division's investigation summary into evidence.

Perez-Nin testified that during an interview about two weeks after the incident, and in a family team meeting with Alma and her boyfriend almost a month after the removal, Alma said that a bed bug must have caused Carla's injury. Perez-Nin testified that after several more months and other meetings, Alma first suggested other possible causes for Carla's injury. Alma recalled that the day before she discovered the injury, she left Carla alone with a seven-year-old neighbor for five minutes, so that Alma could prepare a bottle. Alma alleged Carla was crying when she returned. Alma also said her boyfriend's brother — the "uncle" — was alone with Carla for thirty minutes the evening before Alma discovered the injury.

The Division had interviewed the uncle the day of Carla's surgery. According to his hearsay statement to the Division's investigator, which the

court considered over the Division's objection, he watched the child for thirty minutes, at around 9:30 p.m., while Alma went to the store.[3] He said the baby seemed fine.

Dr. Gajarawala testified that x-rays revealed Carla had three calcific densities on her right arm, one of which resulted from trauma. She explained that "twisting" or "extreme pulling force" caused Carla's transcondylar humerus fracture. The expert explained that children as young as Carla usually cannot generate the force needed to cause this type of injury to themselves. Dr. Gajarawala opined the injury resulted from non-accidental abuse. She said the symptoms of the fracture would include crying, swelling (within five to eight hours at most), bruising, and inability to move the joint. The pain would occur "right away."

On cross-examination, Dr. Gajarawala doubted that hospital staff worsened Carla's injury by moving and manipulating her arm. She also opined that had Alma grabbed Carla's arm to prevent her from falling off the bed — an alternative means of injury explored at the hearing — Carla's pain would have been immediate and obvious.

---

[3] Asked when he watched the child, he said "it was after he returned home from work so it had to be around 9:30 p.m." However, in the same interview, the uncle said he worked from 8:00 a.m. to 8:00 p.m.

5

Alma did not testify. Her expert in pediatrics and pediatric radiology, Dr. Jack Levenbrown, agreed that Carla suffered a fracture caused by twisting, and the child did not do it to herself. He opined that swelling would become evident within twelve hours of injury. However, comparing the x-rays taken at each facility that treated Carla, Dr. Levenbrown opined that the fracture worsened as a result of manipulation and movement by medical providers. He opined that the injury may have been minor when it first occurred, so that Alma would not have noticed it immediately. He also opined that the type of fracture Carla suffered was not associated with abuse, based on his personal experience and his familiarity with abuse literature.

Dr. Levenbrown also suggested other explanations for Carla's injury. He said Alma may have injured Carla by pulling her arm to prevent her from falling off the bed while being changed. Alternatively, the seven-year-old neighbor, or the uncle may have injured the child. Dr. Levenbrown found the latter possibility most likely.

In a cogent written opinion, Judge David B. Katz found the Division proved, by a preponderance of the evidence, that Alma abused or neglected Carla under N.J.S.A. 9:6-8.46(a)(2). The judge recounted the facts we have summarized. He found both lay witnesses and experts credible, although the

judge rejected Dr. Levenbrown's conclusions.  Critically, the court found that Carla's elbow likely did not become swollen until the afternoon.  The judge relied on Alma's statement to a Division worker, that after she could not get in to the see the pediatrician and returned home, she began to worry "as the elbow began to become swollen."  The judge also relied on a hospital triage note, stating that Alma reported that "by afternoon, the right arm is [sic] swollen."[4]

The court noted that absent direct proof, prima facie evidence of abuse or neglect may be presented by "proof of injuries sustained by a child . . . of such a nature as would ordinarily not be sustained or exist except by reason of the acts of omissions of the parent or guardian," citing N.J.S.A. 9:6-8.46(2).  The court concluded the Division presented such proof.  The court noted that both experts agreed that the injury "had to occur with force and by some mechanism," and he credited Dr. Gajarawala's opinion the injury was caused by abuse.  Carla could not have injured herself.

Since swelling appears within at most twelve hours after injury, and the swelling appeared in the afternoon, the judge concluded that only Alma had contact with the child when she was injured.  Based on that conclusion, Judge

---

[4]  We recognize that there was also evidence in the record that Alma noticed swelling as early as 10:00 a.m.

Katz explicitly declined to shift the burden of persuasion to Alma as permitted by In re D.T., 229 N.J. Super. 509 (App. Div. 1988), in cases involving multiple caregivers during the period an injury occurred.

The judge nevertheless considered and rejected the three theories Dr. Levenbrown advanced to refute the Division's prima facie case. The judge rejected the suggestion that Alma accidentally injured Carla by grabbing her arm while changing her diaper, which occurred two days before Alma discovered the injury. The judge noted the absence of details about how that occurred; Alma's failure to mention the incident during multiple interviews over many months; and the fact that Carla exhibited no evidence she experienced pain until two days later.

The judge also rejected the scenarios that the seven-year-old neighbor or the paternal uncle injured Carla. The court highlighted the lack of details to support Dr. Levenbrown's opinion that either person injured the child. The judge noted that Alma admitted when she gave Carla her night-time bath before putting her to bed, Carla did not appear to be in pain, nor was any bruising or swelling evident. Alma also delayed alleging Carla was left with others until long after the incident.

The judge concluded "that the Division has satisfied its burden of proof that [Carla] was abused or neglected due to the transcondylar fracture suffered by the child between 9:00 p.m. on May 12 when the child was bathed by [Alma] without incident and without there being any indications of pain or other symptoms, and May 13 when [Alma] reported the bruising, pain and swelling, with the x-rays on that date confirming the fracture."

On appeal, Alma contends the abuse and neglect finding against her must be reversed because the trial judge improperly shifted the burden of proof to her under the doctrine of conditional res ipsa loquitur. She also argues the judge's finding of abuse and neglect was based on insufficient evidence. Having reviewed the record and governing legal principles, we reject her arguments.

We generally defer to the Family Court's fact-finding because of the court's "special expertise" in family matters and the court's "superior ability to gauge the credibility of the witnesses who testify before it." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). We will not disturb a trial court's fact-finding "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a

denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). However, we scrutinize more closely a "trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (internal quotations omitted), and we review issues of law de novo, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

In a fact-finding hearing under Title 9, "(1) any determination that the child is an abused or neglected child must be based on a preponderance of the evidence and (2) only competent, material and relevant evidence may be admitted." N.J.S.A. 9:6-8.46(b). In this case, under its theory of abuse and neglect, the Division was required to prove that Alma

> [i]nflict[ed] or allow[ed] to be inflicted upon [Carla] . . . physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ.
>
> [N.J.S.A. § 9:6-8.21(c)(1).]

Oftentimes "[i]t is difficult to marshal direct evidence of parental abuse and neglect because of the closed environment in which the abuse most often

occurs and the limited ability of the abused child to inculpate the abuser." N.J. Div. of Youth & Family Servs. v. S.S., 275 N.J. Super. 173, 179 (App. Div. 1994). Consequently, at a fact-finding hearing, "proof of injuries sustained by a child . . . of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child . . . is an abused or neglected child[.]" N.J.S.A. 9:6-8.46(a)(2).

In N.J. Division of Youth & Family Services v. J.L., 400 N.J. Super. 454, 470 (App. Div. 2008), we applied traditional res ipsa loquitur principles "where the child [was] exposed to a number of unidentified individuals over a period of time, and it [was] unclear as to exactly where and when the child's injuries took place[.]" Thus, "once the Division establishes a prima facie case of abuse or neglect under N.J.S.A. 9:6-8.46[(a)](2), the burden will shift to the [defendant] to come forward with evidence to rebut the presumption of abuse or neglect," but the burden of persuasion remains with the Division. Ibid.

In J.L., the child suffered fractures and "extended family, including the two grandmothers or other relatives and friends . . . visited" and the child was "in the custody of medical personnel on various occasions and subjected to various procedures, . . . which required physical restraint." Id. at 469. Under

11

those circumstances, we held, "parents are not obligated to present evidence. They may choose to rest and allow the court to decide the case on the strength of the Division's evidence." Id. at 472.

However, where a "defined number of people ha[d] access to the child at the time the abuse definitively occurred," we have shifted the burden of persuasion to the parents under a paradigm known as "conditional res ipsa loquitur." Id. at 468-69 (discussing In re D.T., 229 N.J. Super. at 517). [5] In In re D.T., we held that where,

> a limited number of persons, each having access or custody of a baby during the time frame when a sexual abuse concededly occurred, no one else having such contact and the baby being then and now helpless to identify her abuser, . . . [t]he burden would then be shifted, and such defendants would be required to come forward and give their evidence to establish non-culpability.
>
> [229 N.J. Super. at 517 (citing Anderson v. Somberg, 67 N.J. 291, 298-99 (1975)).]

---

[5] In J.L., we noted that the conditional res ipsa loquitur paradigm was applied in S.S. 400 N.J. Super. at 469. In that case, the defendant was "one of a limited number of people in control of [the child] when she was injured." 275 N.J. Super. at 181. But we distinguished the case on the ground that the defendant did not dispute whether the facts triggered the burden-shifting paradigm, but challenged the doctrine on constitutional grounds. J.L., 400 N.J. Super. at 469.

A-4740-17T4

Alma contends that traditional res ipsa loquitur principles apply, as under J.L., and that the court inappropriately shifted the burden of persuasion to her, as under In re D.T. We agree as to the first point, but not as to the second. Rather, Judge Katz correctly applied traditional res ipsa loquitur principles. The court never shifted the burden of persuasion to Alma. Instead, the court found that the Division established a prima facie case of abuse or neglect under N.J.S.A. 9:6-8.46(a)(2) by presenting evidence that the child's injuries were "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omission of the parent or guardian." The court relied on the expert testimony that someone must have twisted or exerted great force on Carla's arm in order to cause her fracture; and her injuries were not self-inflicted.

The only burden imposed on Alma was the burden of production — to present evidence to rebut the prima facie case. She presented such evidence — in the form of Dr. Levenbrown's opinion that the uncle, the seven-year-old neighbor, or even Alma, while changing the baby two days earlier, may have injured Carla. But, the court found those scenarios implausible and rejected them. The judge concluded, with adequate record support, that Alma must have caused the fracture because she was the only person in contact with Carla when the injury must have occurred. We are obliged to defer to the fact finding.

13

We find no merit in Alma's argument challenging the sufficiency of the evidence. The court gave significant weight to Dr. Gajarawala's testimony that Carla's injury was caused by a twisting or pulling force and could not have been caused by Carla herself. The court highlighted that only Alma had access to Carla during the time the injury took place.

The court found Dr. Levenbrown's theories about other persons who may have caused Carla's injury to be speculative and factually inaccurate. Alma argues that Dr. Gajarawala's radiologic experience was limited, but she does not appeal from the court's decision to admit her as an expert, although the court did so over her objection. In any event, an expert's qualifications "are generally addressed to the discretionary determination of the trial judge." Correa v. Maggiore, 196 N.J. Super. 273, 282 (App. Div. 1984).

Alma also argues that Dr. Levenbrown's analysis was grounded in deeper experience in pediatric radiology. But, we will not disturb the court's decision to credit one expert over the other. See In re Guardianship of DMH, 161 N.J. 365, 382 (1999) (stating "we rely on the trial court's acceptance of the credibility of the expert's testimony").

We recognize that Alma's recollection that she bathed Carla at 9:00 p.m. and then put her to bed did not comport with the uncle's recollection that he

14                                                                      A-4740-17T4

watched the child for about thirty minutes, around 9:30. However, that discrepancy does not undermine the trial court's ultimate finding, for three reasons. First, the court was not obliged to resolve that timing discrepancy in order to credit a statement in the Division records that Alma put Carla to bed after the bath. The uncle may have been mistaken that he watched the child at 9:30 p.m., or the Division worker may have reported the time in error. The uncle's only explanation for surmising he watched the child at around 9:30 p.m. was that he did so after returning from work; but he said he worked until 8:00 p.m., which gave him ample time to watch the child before 9:00 p.m., when Alma said she bathed Carla.

Second, regardless of what time the uncle watched the child, had he injured Carla's arm, she would have expressed some pain or discomfort, accepting Dr. Gajarawala's testimony that the injury was of the sort that would trigger a pain response.

Third, one may infer the injury occurred after the uncle watched the child, because the swelling did not first appear until the afternoon the next day. The court found, based on competent evidence in the record, that the swelling arose in the afternoon. Working backward twelve hours — the outside limit by which swelling would arise after the fracture according to Dr. Levenbrown — Carla

must have suffered the injury after midnight, at the earliest. At that point, only Alma cared for Carla. Alma resorts to mere speculation that her boyfriend, or the grandfather may have interacted with Carla during that period and caused her injury. Although they were both in the home overnight, Alma stated that only she cared for the child, bathing her, putting her to bed, feeding her about 3:00 a.m. in the early morning, and then bathing her again at around 10:00 a.m.

In sum, as the trial court's findings were not "wide of the mark," we will not disturb them.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION