IN THE MATTER OF D.T., A MINOR.

Superior Court of New Jersey
Appellate Division

Submitted on November 7, 1988—Decided December 28, 1988.

Before Judges SHEBELL, GRUCCIO and LANDAU.

*W. Cary Edwards,* Attorney General, attorney for appellant New Jersey Division of Youth and Family Services (*Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Barbara A. Harned,* Deputy Attorney General, on the brief).

*Alfred A. Slocum,* Public Defender, attorney for respondent-guardian ad litem New Jersey Office of the Public Defender

(*Susan E. Van Amburgh*, Assistant Deputy Public Defender, of counsel and on the brief).

*Michael R. Ascher* and *Paul M. Selitto* attorneys for respondents P.T. and K.T. (*Einhorn & Harris*, attorneys; *James, Wyckoff, Vecchio & Putman*, Co–Counsel; *M. Ascher* and *P. Selitto* on the letter brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

This case was initiated by the complaint of the Division of Youth and Family Services (DYFS) pursuant to the provisions of *N.J.S.A.* 9:6–8.21 and *N.J.S.A.* 30:4C–12, after the physician of four month old D.T. reported, and subsequent examination confirmed, that she had been sexually abused.

D.T. is the daughter of K.T. and P.T. On August 12, 1987, she was cared for by her great aunt M.J.H., great uncle J.H. and cousins D.H. and J.H. between 7 a.m. and 5 p.m. when her father K.T. took her home. M.J.H. testified that no one had any contact with the infant out of her presence.

At 6:15 p.m. the T.s brought D.T. to the home of a friend, A.F., who baby-sat while P.T. attended a physical therapy session necessitated by an earlier accident. A.F.'s husband and two grandchildren, B.C. and G.C., were present, but A.F. testified that she was present at all times during the approximately 1¼ hour period when she was babysitting. At 7:30 p.m., P.T. and K.T. came to take the child home. D.T. was at home with her parents that evening. No one noticed anything unusual about the child on the 12th.

At 7:00 a.m. on the 13th, P.T. again took D.T. to M.J.H.'s house. M.J.H. had been assisting in D.T.s care since P.T.s accident. The baby's cousin, J.H., who was also at the H. house that day, testified that she did not abuse D.T.

At about 8:00 a.m., M.J.H. changed D.T.'s diapers, and noticed no injury. Shortly thereafter, however, she detected that D.T.

was feverish, and so P.T. called her physician's office stating that D.T. was "wheezing". An afternoon appointment was scheduled. Later, as the child seemed worse, another call was made and the doctor suggested that D.T. be given Tylenol and a tepid bath.

M.J.H. and P.T. bathed D.T., and as M.J.H. applied lotion to the infant, both observed redness in her vaginal area. P.T. immediately brought D.T. to the physician's office. His examination disclosed bruising and swelling within her vagina sufficient to prompt him to contact DYFS.

As a result, a joint investigation by DYFS and the Sussex County Prosecutor's office immediately commenced. With the agreement of K.T. and P.T., the baby was examined at about 7:00 p.m. on August 13 by Dr. Ilene Hershman who found bruising on the left side of the labia majora, reddish purple bruising on the labia minor, deep red bruising on the clitoris, and bruising around the hymen. She diagnosed sexual abuse.

Dr. Hershman had several opportunities to opine as to when the abuse occurred. Although her statements varied somewhat, it is fair to say that she concluded that the abuse occurred, at most, within the 24 hours prior to her 7:00 p.m. examination, and more likely within about 12 hours. Dr. Hershman's initial examination report concluded: "[P]hysical existence of acute genital trauma with penetration within 24 hours of exam. The penetration does not appear to be penile. It may be digital or caused by a small blunt object." A culture taken by Dr. Hershman during the examination tested positive for chlamydia, a sexually transmitted bacteria. The evidence does not show how long it takes for that infection to develop, but it can be transmitted at birth. In subsequent tests, both K.T. and P.T. tested negative for this infection.

Initially, K.T. and P.T. signed a Division Service Agreement which agreed to D.T.s temporary placement with relatives and supervised visitation. They also agreed to cooperate with the investigation.

On August 14, the T.s took D.T. and disappeared, prompting an unsuccessful police search. On August 17, however, they appeared with the child at the Hopatcong Police Department. A Voluntary Foster Home Placement Agreement was executed and D.T. was temporarily placed in a foster home. On August 31, 1987, an Initial Court Order approving the foster home placement was entered, although the T.s had already begun efforts to end the voluntary placement. On August 26, because of these efforts, DYFS filed a verified Complaint for Protective Services With Custody. *See N.J.S.A.* 9:6–8.21, *et seq.; N.J.S.A.* 30:4C–12; *R.* 5:12–1, *et seq.* Following four days of hearings in September, the trial judge granted a motion for dismissal of DYFS' complaint at the end of its proofs, finding that although D.T. had been sexually abused, the proofs were inadequate to establish that either K.T. or P.T. had either committed or allowed the sexual abuse. *See N.J.S.A.* 9:6–8.21(c)(3).

On DYFS' Motion for Stay Pending Appeal, we modified an interim protective order, and elected to summarily consider the appeal. This resulted in a reversal and remand under the *Dolson* interpretation of *R.* 4:37–2(b), because "there was sufficient evidence adduced by DYFS to constitute a *prima facia* case if it were given the benefit of all evidence in its favor, including all reasonable inferences which could be drawn therefrom." *See Dolson v. Anastasia,* 55 *N.J.* 2, 5–6 (1969). We ordered that the trial be concluded, with the observation that "[t]he parents may rest or proceed as they choose." The opinion noted that the trial judge prematurely engaged in the factfinding process by deciding that the expert testimony inadequately established that D.T. was in the custody or control of either of her parents at the time the abuse occurred. *In re D.T.,* No. A–498–87T5 (App.Div. Nov. 13, 1987).

On remand, the T.s rested. Neither testified. DYFS modified its complaint and requested that the trial judge continue the matter indefinitely, with protective conditions. DYFS withdrew its request for removal of the child. Instead it requested that the court provide for periodic two month reviews, for

unannounced weekly DYFS visits, for daily visits by a nurse who would examine D.T., and for psychological examination of both parents. Supervision, it was suggested, should continue until D.T. was old enough, perhaps at age three, to be able to herself communicate "what is going on in her life."

The trial judge was understandably troubled because the time factors contained in the only medical proofs presented did not satisfy him by a preponderance of the evidence that either parent committed or allowed the abuse. He stated, "I feel that I have to be satisfied that one or both of D.'s parents has abused or neglected or through some act of omission has allowed that to occur." In this respect, he also relied on dictum in the unreported November 13, 1987 opinion that the critical factual question was whether D.T. was an abused or neglected child as a result of an act or omission of either parent or both.[1]

---

[1] *N.J.S.A.* 9:6–8.21(c) provides:

"Abused or neglected child" means a child less than 18 years of age whose parent or guardian, as herein defined, (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the loss or function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; (3) *commits or allows to be committed an act of sexual abuse against the child;* (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parents or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financial able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risks thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court; (5) or a child who has been willfully abandoned by his parent or guardian, as herein defined; (6) or a child upon whom excessive physical restraint has been used under circumstances which do not indicate that the child's

The complaint was again dismissed, but by reason of a stay, daily visitations by a nurse have continued.

The state of the proofs made it difficult to establish by a preponderance of evidence which of the finite group of possible abusers committed the acts of abuse, or that the parents knowingly allowed such acts. We disagree with the arguments made on behalf of K.T. and P.T. that they were definitively excluded as abusers by reason of Dr. Herschman's time estimates or by reason of the delayed negative chlamydia tests. The predominant Hershman time estimates clearly permit inclusion of the parents. Negative chlamydia test results can occur as early as two days following inception of treatment. Thus the facts clearly and convincingly established not only the fact of sexual abuse, but that the abuser had to be one of a handful of close friends or relatives, two of whom were the parents.

Was it correct to dismiss the DYFS complaint upon the grounds of inadequacy of proof?

DYFS argues that the facts clearly point to one or both of the T.s as an abuser or person who wrongfully allowed the abuse. We decline to second guess the trial judge in his assessment that DYFS failed to establish that P.T. or K.T. sexually abused or allowed the abuse of D.T. by a preponderance of the evidence. *See Rova Farms Resort v. Investors Ins. Co.* 65 *N.J.* 474, 483 (1974). Such a conclusion was not manifestly inconsistent with the evidence. *See Fagliarone v. North Bergen Tp.*, 78 *N.J.Super.* 154 (App.Div.1963), certif. den. 40 *N.J.* 221 (1963); *N.J.S.A.* 9:6–8.50.

---

behavior is harmful to himself, others or property; (7) or a child who is in an institution and (a) has been placed there inappropriately for a continued period of time with the knowledge that the placement has resulted or may continue to result in harm to the child's mental or physical well-being or (b) who has been willfully isolated from ordinary social contact under circumstances which indicate emotional or social deprivation. (Emphasis supplied.)

DYFS also urges that the interests of D.T. and those of many other infant victims of conceded sexual abuse will be adversely affected by the "narrow" interpretation of who is an "abused child" applied by the trial judge. DYFS asserts:

> Contrary to the trial judge's ruling, the statute does not require that the division always prove a parent either actually committed the sexual abuse or, knowing of risks, placed the child in a position where the abuse could occur. Rather, the language of the Act is broad enough to recognize that there are situations which may not come precisely within the specific definitions in the statute but in which, nevertheless, the child is in need of protection ... Since the purpose of *N.J.S.A.* 9:6–8.21 *et seq.* is unquestionably the 'protection of children' ... a construction of the statute which extends its protection to infants such as D.T. would surely 'sustain the probable legislative purpose.'

Respondents K.T. and P.T. and the Public Defender, appointed law guardian for D.T., say that the interpretation of the trial judge accords with the literal and unambiguous language of the statute. They point to the dictionary definitions of "allow" which unquestionably contain connotations of neglect, positive sanction, and at least an awareness of the action which has been permitted. *See, e.g., Webster's Ninth New Collegiate Dictionary* 72 (1983).

We do not find it necessary to challenge the statutory interpretation of "allow" afforded by the trial judge. Mindful of the limited protective relief for D.T. here sought, not implicating custody or termination of parental rights, *compare In re B.C.H.,* 108 *N.J.Super.* 531 (App.Div.1970), and the express purpose of the statute,[2] we hold that the DYFS action should not have been dismissed.

---

[2]The legislative statement appended to the Child Abuse Law provides:

> This bill recognizes that children have certain legal rights, most important of these being the right of protection from physical abuse and neglect. The purpose of this bill is to insure that these rights will be adequately protected by the appropriate courts and social service agencies. Any proceedings under this this bill will be carried out with the best interests of the child or children involved as the primary concern [Statement, Senate Bill No. 127].

Additionally, the legislation itself states:

Were this a tort suit brought against a limited number of persons, each having access or custody of a baby during the time frame when a sexual abuse concededly occurred, no one else having such contact and the baby being then and now helpless to identify her abuser, would we not recognize an occasion for invocation of the *Anderson v. Somberg* doctrine? The burden would then be shifted, and such defendants would be required to come forward and give their evidence to establish non-culpability. *See Anderson v. Somberg*, 67 *N.J.* 291, 298–299 (1975), *cert.* den. 423 *U.S.* 929, 96 *S.Ct.* 279, 46 *L.Ed.*2d 258 (1975).

Shifting of the burden is no less appropriate here, particularly as neither punitive relief nor damages are sought, but only continued limited DYFS monitorship of an admittedly abused child.[3]

The purpose of this act is to provide for the protection of children under 18 years of age who have serious injury inflicted upon them by other than accidental means. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected. [*N.J.S.A.* 9:6–8.8]

[3]We understand the concern of our colleague that shifting the burden in this unique case might unfairly impact upon an innocent parent. However, our opinion does not assign fault to anyone. It is limited to whether it was proper to dismiss this case, as compared to granting DYFS's request for a suspension. P.T. and K.T. may have violated their initial agreement with DYFS for a few days, arguably creating a basis for a finding of neglect. However, a failure to make such finding would not be reversible as an abuse of discretion, nor may such fortuitous violations be anticipated in future cases involving similar *"Anderson"* scenarios. We leave open for future determination the question whether shift of burden approach will be appropriate on a given set of facts involving final action such as a termination of parental rights. As the limited alternative of suspension with conditions here exists, we are unwilling to cut D.T. adrift without monitorship until a trial judge is reasonably satisfied of her safety. Ideally, the legislature should directly address the problems of interim and permanent protection for infants who indisputably have been abused under circumstances which neither prove nor rule out parental involvement. We so recommend.

We note that although the law guardian's brief before us now asks that we sustain the dismissal, she took the position in the trial court that DYFS intervention was warranted until D.T. could vocalize what, if anything, was happening to her.

The infant's parents, K.T. and P.T., elected not to come forward and testify, perhaps encouraged in part by the comment in our prior opinion that defendants were free to rest, as indeed they were. Perhaps, too, their election was motivated by the prosecutor's investigation. No matter. The T.s then had no indication that they would be held to a burden of establishing by a preponderance of the evidence that they neither improperly allowed nor committed the sexual abuse. They should be afforded the right to do so if they so elect.

On these facts, it was error to dismiss entirely the DYFS complaint, without satisfaction of that burden by K.T. and P.T. Until and unless the burden is so satisfied, we interpret *N.J.S. A.* 9:6–8.50(e), consistent with the previously quoted statements of purpose, as broad enough to warrant a finding of possible abuse or neglect sufficient to require suspension of the trial.

We reverse the judgment of dismissal, and order a suspension of the final dispositional hearing, subject to the following protective conditions:

1. Physical examination of D.T. by a DYFS designated nurse on 24 hours notice, no less than 5 times per month.

2. Psychological examination of each parent with emphasis on any problems which might relate to child sexual abuse.

3. DYFS visitation on 24 hours notice, at least once per month.

4. Quarterly reports to the trial judge by DYFS.

The suspension should continue until the earlier of: (a) a conclusion by the trial judge, following further hearing, that the parents' burden has been satisfied; or (b) demonstration by any party to the satisfaction of the trial judge, after hearing, that D.T. is in no further danger of sexual abuse.

The matter is remanded to the trial judge for action required by this opinion.

SHEBELL, J.A.D., concurring in part and dissenting in part.

While I do not subscribe to the position taken by my colleagues, I agree with the result to the extent that they would continue a protective order. I would impose the same protective conditions until such time as the Family Part judge is satisfied that the infant is in no further danger, or that the parents have demonstrated their ability to properly protect their child. I would not have the protective order contingent upon proof of parent culpability under the Child Abuse Law. *See N.J.S.A.* 9:6–8.21(c).

The factual scenario in my judgment does not lend itself to the final resolution sought by the majority. Their solution to the present dilemma of shifting the burden to the parents might unjustly serve to place guilt upon a parent for the heinous offense of sexual abuse merely because of the parent's inability to prove innocence.

It may never be proven by whom this infant was brutalized. What is clear, however, is that the parents, with knowledge of the danger to the child by reason of the previous serious sexual abuse, in violation of the agreement they signed with DYFS, absconded with the child for several days. This placed the child in further jeopardy and constituted neglect under *N.J.S.A.* 9:6–1(b). This is sufficient basis for the court to enter a supervisory order.

I therefore dissent from those portions of the majority opinion which would apparently hold the parents "to a burden of establishing by a preponderance of the evidence that they neither improperly allowed nor committed the sexual abuse." I am not however opposed to permitting the trier of fact to draw an adverse inference from the failure of a parent to testify or otherwise present evidence of noninvolvement. *See In re Degina*, 94 *N.J.Super.* 267, 274 (App.Div.), certif. den. 49 *N.J.* 368 (1967); *Camden Safe Deposit & Trust Co. v. Green*, 124

*N.J.Eq.* 221, 226 (Ch.1938). *See also Michaels v. Brookchester, Inc.*, 26 *N.J.* 379, 391–92 (1958).