SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**New Jersey Division of Child Protection and Permanency v. J.R.-R.**
**(A-56/57-19) (083807)**

**November 9, 2020 -- Decided September 27, 2021**

**ALBIN, J., writing for a unanimous Court.**

In this appeal, the issue is whether, in a case where the Division of Child Protection and Permanency (DCPP) has established that a child has been abused or neglected while in the care of his parents, the family court can shift the burden of proof to the parents to prove their non-culpability.

Following his admission to a hospital, DCPP sought temporary custody of ten-month-old "Gabriel," alleging he was an abused or neglected child as defined in N.J.S.A. 9:6-8.21(c). Specifically, DCPP charged Gabriel's parents, "Jenny" and "George," with causing multiple injuries to Gabriel, some consistent with Shaken Baby Syndrome.

During a five-day bench trial in 2018, the court heard the testimony of five witnesses, including medical experts called by both sides, and reviewed multiple exhibits. The court concluded that Gabriel was an abused and neglected child and then considered whether DCPP had proven by the preponderance-of-evidence standard "who did what."

Relying on the burden-shifting template in In re D.T., 229 N.J. Super. 509, 517 (App. Div. 1988), the court held that, after DCPP proved by a preponderance of the evidence that Gabriel was a victim of abuse and neglect, the burden shifted to Jenny and George -- "the only two people [who] had dominion, control and also a legal duty to protect and care" for their son -- to rebut by a preponderance of the evidence "that they either inflicted or allowed to be inflicted these injuries."

In light of that legal paradigm, the court evidently determined that Jenny and George had not satisfied their burden. The court found -- without specifically identifying "who actually failed to supervise" or "who actually caused the injuries" -- that both Jenny and George were responsible for the abuse and neglect of Gabriel under Title Nine.

The Appellate Division affirmed, and the Court granted Jenny's and George's petitions for certification, 241 N.J. 199 (2020); 241 N.J. 200 (2020).

1

**HELD:** The Legislature placed on DCPP the burden of proving by a preponderance of the evidence that a parent abused or neglected a child, N.J.S.A. 9:6-8.46(b)(1), and the Judiciary has no commission to exercise equitable powers to alter the statutory burden of proof set forth by the Legislature. The Court disapproves of the Appellate Division cases that have imported the doctrine of conditional res ipsa loquitur from the common law into a comprehensive statutory scheme to relieve DCPP of its burden of proving that a particular parent abused or neglected a child. The Court remands for a new hearing.

1. New Jersey's child-welfare laws balance two competing interests: a parent's constitutionally protected right to raise a child and maintain a relationship with that child, without undue interference by the State, and the State's responsibility to protect the welfare of children. Although Title Nine's "paramount concern" is the "safety" of children and its "primary consideration" is a child's "best interests," N.J.S.A. 9:6-8.8(a), the Legislature enacted procedural protections to guarantee a parent or guardian, alleged to have committed an act of abuse or neglect, a fair process and hearing. Those procedural protections require that "any determination that the child is an abused or neglected child must be based on a preponderance of the evidence." N.J.S.A. 9:6-8.46(b). DCPP bears the burden of proving by a preponderance of the evidence that a parent or guardian has abused or neglected a child. (pp. 17-18)

2. Title Nine places on DCPP the burden of proving that a parent abused or neglected a child but also grants DCPP the benefit of an inference in abuse and neglect cases based on the nature of the injuries suffered by a child. N.J.S.A. 9:6-8.46(a)(2) does not shift the burden of proof to the parents. Instead, it merely allows for the drawing of an inference from evidence, similar to the way the doctrine of res ipsa loquitur works in a common law negligence case: if the child was under the supervision of a parent when the child suffered an injury, and if there is no indication the injury was the result of a mere accident, then DCPP has presented prima facie evidence of abuse or neglect. Significantly, under traditional res ipsa, the ultimate burden of persuasion always remains with the plaintiff, although the defendant has a strong incentive to dispel the inference. (pp. 18-21)

3. In D.T., a trial judge considered allegations that D.T.'s parents had committed child abuse and determined that DCPP's predecessor agency had failed to prove "by a preponderance of the evidence that either parent committed or allowed the abuse." 229 N.J. Super. at 511-14. Although the Appellate Division declined to reject the trial judge's factfindings that the agency had failed to establish the parents' culpability, a majority of the panel concluded that shifting the burden of proof to the parents was appropriate under the circumstances. Id. at 515-18 (noting that the burden would shift in a tort suit under the doctrine set forth in Anderson v. Somberg, 67 N.J. 291, 298-99 (1975)). The majority remanded to the trial court for a new hearing, placing on the parents the "burden of establishing by a preponderance of the evidence that they neither improperly allowed nor committed the sexual abuse." Id. at 518. (pp. 21-23)

2

4.  The burden-shifting paradigm referred to in D.T. -- sometimes called "conditional res ipsa loquitur" -- comes from the common law tort action in Anderson, 67 N.J. at 298-302. In that case, during surgery, the tip of a surgical tool broke off and became lodged in the plaintiff's spine.  67 N.J. at 294-95.  The "plaintiff sued all who might have been liable for his injury," and the Court reasoned that "an equitable alignment of duties owed plaintiff requires that not only the burden of going forward shift to defendants, but the actual burden of proof as well."  Id. at 295, 300 (emphasis added).  Because all of the defendants owed a duty of care to the unconscious plaintiff undergoing surgery and were in the best position "to prove their freedom from liability," the Court held that the burden of proof shifted to the defendants.  Id. at 302.  (pp. 23-24)

5.  The Court explains that it has no authority to import the burden-shifting equitable doctrine of conditional res ipsa loquitur from tort law into Title Nine, a comprehensive and carefully conceived statutory scheme in which the Legislature has determined that DCPP bears the burden of proving by a preponderance of the evidence that a parent or guardian has committed an act of child abuse or neglect.  The Court's superintendence of the common law is different from its role in construing a statute or a statutory scheme. No statute in Title Nine remotely suggests that the Legislature intended to shift the burden of proof to a parent accused of abuse or neglect.  If the Legislature intended such a burden-shift in Title Nine, it would have said so explicitly.  DCPP is thoroughly equipped to investigate and prosecute allegations of abuse or neglect without resort to the burden-shifting approach adopted in Anderson, and the preponderance of the evidence standard is the least difficult standard of proof to vault.  In imposing the burden of proof on DCPP, the Legislature recognized the momentous adverse impact that a finding of abuse or neglect will have on a parent's life and relationship with the child.  (pp. 24-29)

6.  The Court rejects the burden-shifting paradigm that D.T. enunciated for abuse and neglect cases because it is in conflict with the statutory framework of Title Nine.  Here, the family court's mistaken conception that the burden of proof shifted to Jenny and George rendered its factfindings fatally flawed and denied the parents a fundamentally fair hearing.  The Court does not pass judgment on the weight or the sufficiency of the evidence presented by DCPP, but rather holds only that the family court must conduct a new hearing, follow the dictates of Title Nine, and determine whether DCPP has carried the burden of persuasion by a preponderance of the evidence that either or both parents committed an act of abuse or neglect as defined in N.J.S.A. 9:6-8.21.  In making that determination, the court may draw reasonable inferences consistent with N.J.S.A. 9:6-8.46(a)(2). (pp. 29-31)

**REVERSED and REMANDED for a new hearing.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.**

3

SUPREME COURT OF NEW JERSEY

A-56/57 September Term 2019

083807

New Jersey Division of
Child Protection and Permanency,

Plaintiff-Respondent,

v.

J.R.-R. and G.R.-R.,

Defendants-Appellants.

In the Matter of G.R.-R., Jr., a Minor-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| November 9, 2020 | September 27, 2021 |

Laura M. Kalik, Designated Counsel, argued the cause
for appellant J.R.-R. (Joseph E. Krakora, Public
Defender, Office of Parental Representation, attorney;
T. Gary Mitchell, Deputy Public Defender, and Robyn
A. Veasey, Deputy Public Defender, of counsel, and
Laura M. Kalik, of counsel and on the briefs).

Beth Anne Hahn, Designated Counsel, argued the
cause for appellant G.R.-R. (Joseph E. Krakora, Public
Defender, Office of Parental Representation, attorney;
T. Gary Mitchell, Deputy Public Defender, and Robyn
A. Veasey, Deputy Public Defender, of counsel, and
Beth Anne Hahn, of counsel and on the briefs).

1

Sara M. Gregory, Deputy Attorney General, argued the cause for respondent New Jersey Division of Child Protection and Permanency (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel, and Sara M. Gregory and Amy Melissa Young, Deputy Attorney General, on the briefs).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for respondent G.R.-R., Jr. (Joseph E. Krakora, Public Defender, Office of the Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel, and Noel C. Devlin, of counsel and on the briefs).

Steven M. Resnick argued the cause for amicus curiae New Jersey Association for Justice (Ziegler, Zemsky & Resnick, attorneys; Steven M. Resnick and Angela M. Scafuri, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

The Legislature has assigned to the Division of Child Protection and Permanency (DCPP) the burden of proving by a preponderance of the evidence that a parent has committed an act of abuse or neglect against a child in violation of N.J.S.A. 9:6-8.21(c)(4)(b). In this appeal, the issue is whether, in a case where DCPP has established that a child has been abused and neglected while in the care of his parents, the family court can shift the burden of proof to the parents to prove their non-culpability.

DCPP charged J.R.-R. (Jenny) and G.R.-R. (George) with the abuse and neglect of their ten-month-old son G.R.-R. (Gabriel).[1]  At an abuse and neglect hearing conducted in the Family Part, the court heard testimony from DCPP caseworkers and medical experts.  The family court first determined that DCPP had proven that Gabriel had been abused and neglected and that his parents had been his sole caretakers when he suffered his injuries.  Relying on In re D.T., 229 N.J. Super. 509, 517 (App. Div. 1988), and the doctrine of conditional res ipsa loquitur, the court then held that the burden of persuasion had shifted to each of the parents to establish that they were not culpable.  Finding that Jenny and George had not satisfied their burden, the court concluded that DCPP had proven by a preponderance of the evidence the charges of abuse and neglect against the parents.

The Appellate Division affirmed, asserting that the family court properly applied the conditional res ipsa doctrine to shift the burden of proof to the parents, and concluded that sufficient credible evidence in the record supported the court's abuse and neglect findings.

We now reverse.  When a court finds that a parent has committed an act of abuse or neglect against a child, the parent faces serious consequences that

---

[1] To preserve the privacy of the parties, we adopt the pseudonyms used by the Appellate Division.

could include the termination of the parent's custodial rights to the child. In enacting child-welfare laws in Title Nine, the Legislature placed on DCPP the burden of proving by a preponderance of the evidence that a parent abused or neglected a child. N.J.S.A. 9:6-8.46(b)(1). Although the statutory scheme allows for the nature of a child's injuries to constitute prima facie evidence of abuse or neglect under N.J.S.A. 9:6-8.46(a)(2), nowhere in Title Nine has the Legislature authorized shifting the burden of proof to the parent. Neither before nor during the abuse and neglect hearing were Jenny and George given notice that the burden would shift to them to prove that they were not the responsible parties.

The Legislature, mindful of the due process rights of parents, carefully crafted a statutory scheme allocating the burden of proof to the agency that brings charges of child abuse or neglect. DCPP has the authority and resources to prosecute abuse and neglect cases within the metes and bounds of the law. The Judiciary has no commission to exercise equitable powers to alter the statutory burden of proof set forth by the Legislature. We disapprove of the Appellate Division cases that have imported the doctrine of conditional res ipsa loquitur from our common law into a comprehensive statutory scheme to relieve DCPP of its burden of proving that a particular parent abused or neglected a child.

4

Accordingly, we reverse the judgment of the Appellate Division and remand for a new hearing on the abuse and neglect charges.

## I.

## A.

In April 2017, DCPP filed an order to show cause and verified complaint seeking temporary custody, care, and supervision of Gabriel who, DCPP alleged, was an abused and neglected child, as defined in N.J.S.A. 9:6-8.21(c). Specifically, DCPP charged Jenny and George with causing "multiple injuries" to their son Gabriel, some "consistent with Shaken Baby Syndrome." The Superior Court, Law Division granted DCPP's application for temporary custody of Gabriel, allowing DCPP to place Gabriel with a resource family. The court also granted Jenny and George the right to have weekly supervised visitation. In accordance with Title Nine, the court scheduled a hearing to determine whether Jenny and George neglected or abused their son.

During a five-day bench trial in the Family Part in April and May 2018, the court heard the testimony of five witnesses and reviewed multiple exhibits, including the investigation report of DCPP caseworker Doris Montalvo. The

5

record before us consists of the testimony and evidence elicited during that hearing.

B.

At the hearing, DCPP called to the stand caseworker Montalvo, whose investigation report and testimony provided the basis for bringing the abuse and neglect charges.

On March 29, 2017, Jenny and George brought Gabriel, then ten months old, to a scheduled appointment with a pediatrician. Two days earlier, Gabriel had begun showing symptoms of illness, including fever and vomiting. When Jenny and George brought Gabriel to the pediatrician's office, he was in respiratory distress, and the decision was made to transport him to Inspira Medical Center in Vineland, New Jersey. At Inspira, Gabriel received a diagnosis of meningitis. He was then transferred to the intensive care unit of Nemours/Alfred I. duPont Hospital for Children in Delaware, where he could receive a higher level of care.[2]

The pediatric neurosurgeon on duty at duPont, Dr. Joseph Piatt, testified that Gabriel arrived with a diagnosis of life-threatening bacterial meningitis[3]

_____

[2] Gabriel was discharged from duPont Hospital approximately three weeks later.

[3] Bacterial meningitis is an inflammation of the membranes surrounding the brain and spinal cord. See Meningitis, Ctrs. for Disease Control,

and had to be intubated because of epileptic seizures. Diagnostic imaging of Gabriel's brain showed a spillage of some blood and a fluid build-up around the outside of the brain.[4] Gabriel also presented with retinal hemorrhages in the back of the right eye, a single bruise to the right eye, and stretched and torn ligaments in the neck that required his neck to be immobilized.

Dr. Piatt opined that meningitis did not explain the bleeding around the outside of Gabriel's brain, the retinal hemorrhages, or the neck injury. He noted that violent movements of the head -- "an acceleration or deceleration injury" -- could cause those types of injuries. However, he did not offer an opinion on how the injuries actually occurred.

Dr. Allan DeJong, the Medical Director of duPont's Children At Risk Program and a physician board-certified in pediatrics and child abuse and neglect, testified that his evaluation of Gabriel's case led him to the conclusion that Gabriel suffered physical trauma unrelated to bacterial meningitis. He did

---

https://www.cdc.gov/meningitis/ (last visited Aug. 13, 2021). Possible symptoms include a headache, fever, and stiff neck, as well as vomiting and seizures. See Bacterial Meningitis, Ctrs. for Disease Control, https://www.cdc.gov/meningitis/bacterial.html/ (last visited Aug. 13, 2021). If left untreated for more than 36 hours, bacterial meningitis may be fatal, and even those who recover may suffer from permanent disabilities and brain damage. Ibid.

[4] The fluid build-up required drainage several months later.

7

indicate, however, that the only "visible sign of trauma" was the bruise over Gabriel's right eye.

Dr. DeJong stated that the blood surrounding Gabriel's brain, the retinal hemorrhages, and the neck injury were not consistent with a meningitis diagnosis. He also observed a well-healed injury to Gabriel's forearm bone and further noted that fluid surrounding his pancreas, along with an elevated level of the enzyme lipase, suggested abdominal trauma. Additionally, Dr. DeJong emphasized that Gabriel's neck injury, evidenced by ligament damage and blood found between the spine and spinal cord, "is highly associated with [a] violent shaking type of injury." Overall, Dr. DeJong opined that the "multiple unexplained injuries [were] consistent with abusive injury."[5]

In contrast, the joint defense medical expert, Dr. Joseph Scheller, a physician board-certified in pediatrics and pediatric neurology, testified that he found no "evidence of abusive head trauma" -- "[n]o scalp injury, no skull injury, no brain injury" -- and he offered alternative and innocent explanations for the findings made by Drs. Piatt and DeJong. Dr. Scheller observed that the bones in Gabriel's neck were "perfectly normal" and reasoned that the strained neck ligaments could have occurred during the procedures to intubate and

---

[5] Dr. DeJong stated that the medical literature did not support any supposition that Gabriel's seizures or medical testing caused his injuries.

8

place a spinal tap in the ten-month-old child.  He also stated that meningitis is one of the known causes of retinal hemorrhaging.  Additionally, Dr. Scheller's review of the diagnostic imaging showed only a thickening of the arm bone, not evidence of a fracture.

Dr. Scheller explained that the presence of "four drops of blood" and fluid between Gabriel's brain and skull could be attributed to a serious brain infection -- meningitis -- and the resultant fever and seizures, as well as a congenital condition, which caused Gabriel's head to grow exponentially in the first ten months of his life.  Last, although Dr. Scheller could not give a reason for the increased enzyme levels and the fluid around Gabriel's pancreas, he discerned no abdominal bruising or internal bleeding -- in short, no evidence of an abdominal injury.

When DCPP caseworker Montalvo reached duPont Hospital -- the same day that Gabriel arrived there -- she found him intubated, his head bandaged, and an eye noticeably bruised.  His father was present in the room.

The next day, while at the hospital, Montalvo interviewed George.[6] During the interview, George explained that he noticed no bruises on Gabriel

---

[6]  Montalvo communicated with George in Spanish.  Although George's primary language is Popti, a Mayan language native to Guatemala and southern Mexico, he was able to speak and understand Spanish but unable to read it.  Jenny does not speak Spanish, and neither Jenny nor George speak English.  The language barrier created difficulties for the caseworker.

before he contracted meningitis, although he saw a "small red spot" on his son's forehead two days before his appointment with the pediatrician. Jenny told him that Gabriel had hit himself with the television remote. George described for Montalvo the daily family routine, stating that he spent most of his day working as a farm laborer or searching for employment while Jenny cared fulltime for Gabriel during the day.

Approximately eight months later, Montalvo interviewed George and Jenny separately using a Popti interpreter. Both parents stated that Jenny was Gabriel's primary caretaker and that George, as the family's provider, worked throughout the day. Both also stated that they took Gabriel to his scheduled appointment shortly after he fell ill.

Jenny explained that she never left Gabriel unsupervised, even when her sister visited. She stated that when she cooked and cleaned, she carried him on her back in a harness. Jenny denied ever shaking or hurting Gabriel, or seeing him fall, and did not know what caused his injuries. Likewise, George denied having any knowledge of how Gabriel might have been injured.

Montalvo, speaking in Spanish to both George and Jenny and gesturing because Jenny only understood Popti, informed the parents that Gabriel's injuries appeared to have been caused by shaking. Both parents adamantly

10

denied that they injured Gabriel, expressed their love for him, and thanked Montalvo for allowing them to respond to the difficult questions she raised.[7]

## C.

On June 5, 2018, the family court sustained the charges that Jenny and George abused and neglected Gabriel.

The court found all three medical experts credible but gave greater weight to the testimony of Drs. Piatt and DeJong. The court determined that, despite some "benign explanations," the "constellation of injuries" indicated "shaken baby syndrome" -- "an event of significant traumatic force [that] likely . . . involved rapid shaking of the child." According to the court, "the telltale signs" of injury to the neck particularly supported that conclusion -- a conclusion not "explained away" by any credible evidence "other than Dr. Scheller's medical speculation at best."

After making the finding that Gabriel was an abused and neglected child, the court stated it had to address "the more challenging aspect" of the case: did DCPP prove by the preponderance-of-evidence standard "who did what?"

---

[7] Gabriel's Law Guardian called the last witness, DCPP "permanency worker" Rosalyn Guzman Soler, who testified that Jenny had given birth to a child in 2014, whom she surrendered to the biological father, and that she had two other children, ages fifteen and eighteen, living in Guatemala with their paternal grandmother. Jenny initially denied that she had three other children. DCPP made no contact with those children or their current families.

In resolving that issue, the court turned to the burden-shifting template in In re D.T., 229 N.J. Super. at 517.  Relying on D.T., the court held that, after DCPP proved by a preponderance of the evidence that Gabriel was a victim of abuse and neglect, the burden shifted to Jenny and George -- "the only two people [who] had dominion, control and also a legal duty to protect and care" for their son -- to rebut by a preponderance of the evidence "that they either inflicted or allowed to be inflicted these injuries."  In light of that legal paradigm, the court evidently determined that Jenny and George had not satisfied their burden.  It noted that the "parties were given fair opportunity to present all of their evidence" and that Jenny and George had declined to testify.

The court found -- without specifically identifying "who actually failed to supervise" or "who actually caused the injuries" -- that both Jenny and George were responsible for the abuse and neglect of Gabriel under Title Nine.[8]

---

[8] The same day that the court made those findings, it conducted a permanency hearing.  Three weeks later, the court approved DCPP's plan to terminate Jenny and George's parental rights.

12

D.

In an unpublished decision, the Appellate Division affirmed.[9] It found that the trial court, in adhering to the doctrine of conditional res ipsa loquitur, properly "shifted the burden to [Jenny and George] to prove non-culpability at the fact-finding hearing." The Appellate Division approved of the burden-shifting paradigm in D.T., which held that when "a limited number of persons" have access to a young child during the timeframe when the child has suffered abuse or neglect, the burden is then shifted to the parents or guardians who are "required to come forward and give their evidence to establish non-culpability." 229 N.J. Super. at 517 (citing Anderson v. Somberg, 67 N.J. 291, 298-99 (1975)).

With D.T. as its guide, the Appellate Division stated that the evidence established "the nature, cause, or severity of Gabriel's injuries" and that Jenny and George "were the only persons supervising Gabriel," and therefore that "they alone bore the burden of proving they were not culpable for the child's injuries." Under that legal framework, the Appellate Division concluded that the trial court's findings of abuse and neglect were "supported by substantial, credible evidence" in the record.

---

[9] We recite only the issues addressed by the Appellate Division that are pertinent to this appeal.

13

We granted Jenny's and George's petitions for certification. 241 N.J. 199 (2020); 241 N.J. 200 (2020). We also granted the motion of the New Jersey Association for Justice to participate as amicus curiae.

## II.

### A.

Jenny and George both argue that the trial court violated their due process rights by not giving them notice at any point before rendering its decision that, if DCPP presented a prima facie case of abuse or neglect, the burden of proof would shift to them to prove their non-culpability. The failure to give notice of the burden-shifting paradigm, they claim, denied them the opportunity to prepare and present a defense. For example, George maintains that if he knew that "he was to be pitted against his wife" by the burden-shift, he could have testified and documented his work schedule, establishing that "he never cared for his son during the time period when the injuries occurred." In addition, at oral argument before this Court, both counsel for the parents agreed that the abuse and neglect statute in Title Nine did not allocate to them the burden of proving their lack of culpability. Last, Jenny and George assert that DCPP failed to present sufficient credible evidence to sustain the charges of abuse and neglect.

Amicus New Jersey Association for Justice submits that, in an abuse and neglect case under Title Nine, the burden of persuasion should always remain with DCPP. The Association asks the Court to bar the application of conditional res ipsa loquitur in such cases.

B.

DCPP contends that the trial court did not shift the burden of proof to defendants, but only found that Jenny and George did not rebut DCPP's prima facie case of abuse and neglect -- consistent with traditional res ipsa principles embodied in N.J.S.A. 9:6-8.46(a)(2).[10] Nevertheless, DCPP argues that even if the trial court shifted the burden of proof to Jenny and George, its complaint and investigation report -- consistent with due process -- provided adequate notice that the burden-shifting paradigm of conditional res ipsa loquitur, as presented in D.T., might "apply because the child sustained non-accidental injuries while in [the parents'] exclusive control." DCPP maintains that burden-shifting is appropriate because infant children "are unable to identify their abusers." Last, DCPP submits that the trial court's findings of abuse and neglect are amply supported by the record.

---

[10] DCPP argues that "this Court is not bound by [DCPP]'s erroneous concession before the Appellate Division that the trial court applied conditional burden-shifting principles."

15

The Law Guardian, on behalf of Gabriel, admits that the trial "court shifted the burden of production and persuasion to Jenny and George."  The Law Guardian argues, however, that burden-shifting is equitable because it furthers the goal of protecting vulnerable children.

### III.

We begin by noting that Jenny and George have primarily argued that shifting the burden of proof to them, without adequate notice, violated their constitutional right to due process.  Before reaching a constitutional issue, however, our first duty is to determine whether the abuse and neglect statute under Title Nine authorized the burden-shift.  We address a constitutional issue only when the issue is ripe and squarely before us.  See Comm. to Recall Robert Menendez from the Off. of U.S. Sen. v. Wells, 204 N.J. 79, 95-96 (2010).

Although we apply a deferential standard in reviewing the family court's findings of fact because of its superior position to judge the credibility of witnesses and weigh the evidence, see Cesare v. Cesare, 154 N.J. 394, 413-14 (1998), we owe no deference "to the Appellate Division's or trial court's interpretive conclusions" about the meaning of a statute, DCPP v. Y.N., 220 N.J. 165, 177 (2014).  We are equally suited to construe a statute, and therefore we perform that task de novo.  See ibid.

We start our analysis with the statutory framework governing the prosecution of child abuse and neglect cases.

A.

New Jersey's child-welfare laws balance "two competing interests: a parent's constitutionally protected right 'to raise a child and maintain a relationship with that child, without undue interference by the [S]tate,' and 'the State's parens patriae responsibility to protect the welfare of children.'" DYFS v. A.L., 213 N.J. 1, 18 (2013) (citations omitted). Title Nine "outlines the standards for abuse and neglect proceedings against parents and guardians." Ibid. The clear purpose of Title Nine is to protect children "who have had serious injury inflicted upon them" and to ensure that they "are immediately safeguarded from further injury and possible death." N.J.S.A. 9:6-8.8(a); see also A.L., 213 N.J. at 18. To that end, Title Nine provides for the civil prosecution of a parent or guardian who abuses or neglects a child. N.J.S.A. 9:6-8.33.

Although Title Nine's "paramount concern" is the "safety" of children and its "primary consideration" is a child's "best interests," N.J.S.A. 9:6-8.8(a), the Legislature enacted procedural protections to guarantee a parent or guardian, alleged to have committed an act of abuse or neglect, a fair process and hearing. A parent or guardian has the right to notice of the charges, see

17

N.J.S.A. 9:6-8.33(a), -8.38; the right to retain and consult with counsel and, if indigent, the right to appointed counsel, N.J.S.A. 9:6-8.43; the right to a "fact-finding hearing," see N.J.S.A. 9:6-8.50(d), -8.46(b); and the right to have "only competent, material and relevant evidence" admitted at the hearing, N.J.S.A. 9:6-8.46(b).

Importantly, the Legislature has decreed that "any determination that the child is an abused or neglected child must be based on a preponderance of the evidence." N.J.S.A. 9:6-8.46(b). DCPP bears the burden of proving by a preponderance of the evidence that a parent or guardian has abused or neglected a child. DYFS v. P.W.R., 205 N.J. 17, 32 (2011); see also A.L., 213 N.J. at 22. Last, the family court must set forth its reasons for sustaining a complaint of abuse or neglect. N.J.S.A. 9:6-8.50(a). Those statutory protections are consistent with the hallmarks of due process. See Jamgochian v. State Parole Bd., 196 N.J. 222, 240 (2008) ("The minimum requirements of due process . . . are notice and the opportunity to be heard." (quoting Doe v. Poritz, 142 N.J. 1, 106 (1995))).

N.J.S.A. 9:6-8.21, in relevant part, provides that an abused or neglected child is one

> whose parent or guardian . . . (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or

18

protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, . . . (4) or . . . whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

[N.J.S.A. 9:6-8.21(c)(1), (4).]

As the statute makes clear, a parent's action or inaction can constitute abuse or neglect. A parent who fails "to exercise a minimum degree of care" by unreasonably allowing harm to be inflicted on a child is accountable under the statute. N.J.S.A. 9:6-8.21(c)(4). A parent cannot stand by mutely as a child is abused; the parent has a duty to intercede on the child's behalf.

As noted earlier, Title Nine places on DCPP the burden of proving that a parent abused or neglected a child. See P.W.R., 205 N.J. at 32; see also A.L., 213 N.J. at 22. But Title Nine also grants DCPP the benefit of an inference in abuse and neglect cases based on the nature of the injuries suffered by a child. N.J.S.A. 9:6-8.46 provides that

proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie

19

> evidence that a child . . . is an abused or neglected child.
>
> [N.J.S.A. 9:6-8.46(a)(2) (emphasis added).]

"[P]rima facie evidence [is] [e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." Black's Law Dictionary 701 (11th ed. 2019). Notably, by its plain language, the statute does not shift the burden of proof to the parents. Instead, the statute merely allows for the drawing of an inference from evidence, similar to the way the doctrine of res ipsa loquitur works in a common law negligence case.

"Res ipsa loquitur, Latin for 'the thing speaks for itself,' is a longstanding evidentiary rule grounded in principles of equity . . . ." McDaid v. Aztec W. Condo. Ass'n, 234 N.J. 130, 142 (2018) (quoting Jerista v. Murray, 185 N.J. 175, 191 (2005)). "The res ipsa doctrine allows a factfinder to draw an inference of negligence" -- and the plaintiff to make out a prima facie case -- "when: (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." Id. at 142-43 (quoting Jerista, 185 N.J. at 192). Like res ipsa, under N.J.S.A. 9:6-8.46(a)(2), if the injury is one that ordinarily would not occur in the absence of abuse or neglect, if the child was under the supervision of a parent, and if there is no indication the

20

injury was the result of a mere accident, then DCPP has presented prima facie evidence of abuse or neglect.

Significantly, under traditional res ipsa, "the ultimate burden of persuasion always remains with the plaintiff," although the defendant has a strong incentive to dispel the res ipsa inference. McDaid, 234 N.J. at 143. "[T]he res ipsa inference is simply permissive," and therefore "the factfinder 'is free to accept or reject' it." Id. at 144 (quoting Jerista, 185 N.J. at 193).

DCPP and the Law Guardian, however, urge this Court to go beyond N.J.S.A. 9:6-8.46(a)(2) and to engraft onto that statute a reallocation of the burden of persuasion -- shifting to the parents the burden of proving they were not culpable -- when DCPP presents prima facie evidence of abuse or neglect. They offer D.T., 229 N.J. Super. at 517, and Anderson v. Somberg, 67 N.J. 291, 299-300 (1975) -- and the doctrine of conditional res ipsa -- as support for their position.

B.

In D.T., a physician examined a four-month-old child and determined that she had been sexually abused within a timeframe during which she was in the company of ten different individuals -- including her parents as well as relatives and friends who babysat the child. 229 N.J. Super. at 511-12. The Division of Youth and Family Services (DYFS), the predecessor agency of

21

DCPP, filed a complaint seeking protective services with custody and alleging that the parents committed child abuse. Id. at 513. At the conclusion of a hearing, the trial judge determined that DYFS had failed to prove "by a preponderance of the evidence that either parent committed or allowed the abuse." Id. at 514.

Although the Appellate Division declined to reject the trial judge's factfindings that DYFS had failed to establish by a preponderance of the evidence the parents' culpability, it concluded that shifting the burden of proof to the parents was appropriate under the circumstances. Id. at 515-18. The court queried:

> [w]ere this a tort suit brought against a limited number of persons, each having access or custody of a baby during the time frame when a sexual abuse concededly occurred, no one else having such contact and the baby being then and now helpless to identify her abuser, would we not recognize an occasion for invocation of the Anderson v. Somberg doctrine? The burden would then be shifted, and such defendants would be required to come forward and give their evidence to establish non-culpability.
>
> [Id. at 517 (emphasis added).]

The Appellate Division reversed the dismissal of the abuse and neglect portion of the complaint and remanded to the trial court for a new hearing, placing on the parents the "burden of establishing by a preponderance of the

22

evidence that they neither improperly allowed nor committed the sexual abuse." Id. at 518.

In a dissent, Judge Shebell disapproved of that resolution, stating that "shifting the burden to the parents might unjustly serve to place guilt upon a parent for the heinous offense of sexual abuse merely because of the parent's inability to prove innocence." Id. at 519.

The burden-shifting paradigm referred to in D.T. -- sometimes called "conditional res ipsa loquitur" -- comes from the common law tort action in Anderson, 67 N.J. at 298-302. In that case, during surgery, the tip of a surgical tool broke off and became lodged in the plaintiff's spine. 67 N.J. at 294-95. The "plaintiff sued all who might have been liable for his injury," including the doctor who performed the surgery, the hospital, the medical supply distributor who furnished the hospital with the surgical tool, and the manufacturer of the surgical tool. Id. at 295.

In that case, we reasoned that "an equitable alignment of duties owed plaintiff requires that not only the burden of going forward shift to defendants, but the actual burden of proof as well." Id. at 300 (emphasis added). Because all of the defendants owed a duty of care to the unconscious plaintiff undergoing surgery and were in the best position "to prove their freedom from

23

liability," we held that the burden of proof shifted to the defendants. Id. at 302.

## IV.

## A.

We have no authority to import the burden-shifting equitable doctrine of conditional res ipsa loquitur from our tort law into Title Nine, a comprehensive and carefully conceived statutory scheme in which the Legislature has determined that DCPP bears the burden of proving by a preponderance of the evidence that a parent or guardian has committed an act of child abuse or neglect. This Court is the final authority on the "collection of judicially crafted principles" known as the common law. See Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 545 (2013). This Court has adapted the common law to the ever-changing circumstances in society and human affairs to ensure that its legal principles continue to reflect "basic notions of fair play and equity." See Orientale v. Jennings, 239 N.J. 569, 575, 592 (2019). Anderson is an example of our developing common law. There, we adopted a burden-shifting rule in a tort case to achieve a "balance of equities." See 67 N.J. at 305.

Our superintendence of the common law, however, is different from our role in construing a statute or a statutory scheme. In passing a law, the

24

Legislature is the preeminent expositor of public policy in our democratic society. See Farmers Mut., 215 N.J. at 528, 545-46. In interpreting a statute or statutory scheme, our simple but "paramount goal . . . is to give effect to the Legislature's intent." Y.N., 220 N.J. at 178 (quoting Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012)). Our starting point is always to examine whether the language of the statute expresses its plain meaning, ibid., and then to read the statute "in context with related provisions so as to give sense to the legislation as a whole," DiProspero v. Penn, 183 N.J. 477, 492 (2005) (quoting Chasin v. Montclair State Univ., 159 N.J. 418, 426-27 (1999)). We strive to "give[] effect to all of the statutory provisions" and not to render any "superfluous" or "void." Sanchez v. Fitness Factory Edgewater, LLC, 242 N.J. 252, 261 (2020) (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 172 (1999)).

We have no commission to "rewrite" a plainly written statute or reason to "presume" that the Legislature intended a different policy from the one expressed in the language of the statute. DiProspero, 183 N.J. at 492; see also Serrano v. Serrano, 183 N.J. 508, 510 (2005) ("We will not substitute our judgment for that of the Legislature and write a new statute."). We cannot take a common law notion of "equity" from a tort setting and engraft it onto Title Nine, thereby upsetting the balance the Legislature struck in ensuring both the

25

best interests and safety of children and the due process rights of parents in an abuse and neglect hearing.  See Farmers Mut., 215 N.J. at 545.

B.

In light of those canons of statutory construction, we first note that no statute in Title Nine remotely suggests that the Legislature intended to shift the burden of proof to a parent accused of abuse or neglect.  N.J.S.A. 9:6-8.46(b) places the burden of proof squarely on DCPP.  P.W.R., 205 N.J. at 32. Additionally, Title Nine codifies the use of the traditional res ipsa inference through N.J.S.A. 9:6-8.46(a)(2), which allows DCPP to establish as prima facie evidence of child abuse or neglect a child's injuries that "ordinarily [would] not be sustained or exist except by reason of the acts or omissions of the parent or guardian."  See also DYFS v. J.L., 400 N.J. Super. 454, 472 (App. Div. 2008) ("T[he] traditional res ipsa loquitur approach represents the correct interpretation of N.J.S.A. 9:6-8.46(a)(2) . . . .").

DCPP's burden of proof, as established by Title Nine, represents one facet of our Legislature's chosen balance between the welfare of children and the rights of parents.  The burden-shifting approach in Anderson -- akin to "conditional res ipsa" -- is solely a creature of our common law and developed in the context of a medical malpractice case for a "narrow set of factual circumstances."  See Estate of Chin v. Saint Barnabas Med. Ctr., 160 N.J. 454,

26

465 (1999). We will not upset the Legislature's chosen design for Title Nine by injecting a common law burden-shifting doctrine into a determination of whether a parent committed a statutory violation of child abuse or neglect. If the Legislature intended such a burden-shift in Title Nine, it undoubtedly would have said so explicitly. See DiProspero, 183 N.J. at 495.

DCPP is charged with the responsibility of protecting the safety and welfare of children, which is a paramount concern of Title Nine. Importantly, DCPP is thoroughly equipped to investigate and prosecute allegations of abuse or neglect without resort to the burden-shifting approach adopted in Anderson. See Y.N., 220 N.J. at 178-79; P.W.R., 205 N.J. at 32-33. Here, the DCPP caseworker interviewed all relevant witnesses, including medical personnel and the parents, and reported on those findings in her testimony before the family court. Here, as well, DCPP brought before the court fact and expert witnesses, who testified that Gabriel was abused and neglected. Additionally, DCPP has the power to subpoena any relevant witnesses to testify at the hearing, including the parents, in prosecuting its case. See N.J.S.A. 9:3A-8.

Family courts hearing Title Nine matters, moreover, need not shift the burden of proof to fulfill their child-protection duties. The preponderance of

the evidence standard is the least difficult standard of proof to vault.[11]  Our

courts must simply decide whether DCPP has presented a preponderance of

"competent, material and relevant evidence" to prove the culpability of a

parent.  See N.J.S.A. 9:6-8.46(b).

In placing the burden of proof on DCPP, the Legislature understood that

"[a] finding of abuse or neglect against a parent may result in significant and

longstanding adverse consequences."  Y.N., 220 N.J. at 179.  Most seriously, a

finding that a parent has abused or neglected a child "may provide a basis for

an action to terminate a parent's custodial rights to a child" under Title Thirty.

Ibid. (citing N.J.S.A. 30:4C-15(a)); see also A.L., 213 N.J. at 26.  Indeed, in

this case, just three weeks after making its finding of abuse and neglect, the

family court in a permanency determination authorized DCPP to proceed

toward termination of parental rights.

---

[11]  Our Rules of Evidence refer to three standards of proof that govern judicial proceedings:  a preponderance of the evidence, clear and convincing evidence, and proof beyond a reasonable doubt.  See N.J.R.E. 101(b)(1).  The preponderance of the evidence standard is satisfied by "that amount of evidence that causes [the factfinder] to conclude that the allegation is probably true.  To prove an allegation by the preponderance of the evidence, a party must convince [the factfinder] that the allegation is more likely true than not true."  Model Jury Charges (Civil), 1.12H, "Preponderance of the Evidence (short version)" (approved Nov. 1998).

Other consequences of a finding of abuse or neglect are likewise grave. A parent's name and information about the case are forwarded to a registry and kept on file by DCPP. N.J.S.A. 9:6-8.11. Moreover, case information may be released for "employment-related screening of an individual . . . seeking employment with an agency or organization providing services to children," as well as to doctors, courts, and child welfare agencies. N.J.S.A. 9:6-8.10a(b)(13); id. at (b)(1), (3) to (6), (13). Further, a court can order a child to be placed "in the custody of a relative or another suitable person for a substantial period of time." A.L., 213 N.J. at 25-26 (citing N.J.S.A. 9:6-8.50(d), -8.51(a), -8.54(a)).

In imposing the burden of proof on DCPP, the Legislature evidently recognized the momentous adverse impact that a finding will have on a parent's life and relationship with the child.

V.

To be clear, we reject the burden-shifting paradigm that D.T. enunciated for abuse and neglect cases because it is in conflict with the statutory framework of Title Nine. We do not agree with DCPP's newly raised argument that the family court did not shift the burden of proof to Jenny and George. The family court specifically stated that this case was "analogous" to D.T., which shifted to the parents the "burden of establishing by a

29

preponderance of the evidence that they neither improperly allowed nor committed" the abuse.  See D.T., 229 N.J. Super. at 518.

In following the logic of D.T., the family court reallocated to Jenny and George the burden of proving "who did what" and imposed on them the burden of proving by a preponderance of the evidence their non-involvement in the abuse and neglect of Gabriel.  In doing so, the family court undermined the procedural protections the Legislature afforded to parents in Title Nine abuse and neglect hearings.  See id. at 519 (Shebell, J.A.D., dissenting).  The appellate panel affirmed the family court's erroneous shifting of the burden of proof to Jenny and George, also relying on the flawed reasoning of D.T.

The family court's mistaken conception that the burden of proof shifted to Jenny and George rendered its factfindings fatally flawed and denied the parents a fundamentally fair hearing.  See Sullivan v. Louisiana, 508 U.S. 275, 281-82 (1993) (holding that a "misdescription of the burden of proof" is a structural error that "vitiates all the jury's findings"); State v. Harvey, 159 N.J. 277, 291 (1999) (noting that burden-of-proof errors "affect the procedural fairness of the trial" (quoting State v. Martini, 139 N.J. 3, 26 (1994))).  We do not pass judgment on the weight or the sufficiency of the evidence presented by DCPP.  We hold only that the family court must conduct a new hearing, follow the dictates of Title Nine, and determine whether DCPP has carried the

30

burden of persuasion by a preponderance of the evidence that either or both parents committed an act of abuse or neglect as defined in N.J.S.A. 9:6-8.21. In making that determination, the court may draw reasonable inferences consistent with N.J.S.A. 9:6-8.46(a)(2).

Because we have resolved the issue before us on statutory grounds, we do not consider defendants' constitutional claims, including their argument that due process required that they receive advance notice before a burden-shift. See Comm. to Recall Robert Menendez, 204 N.J. at 95 ("[I]f a case may be decided on either statutory or constitutional grounds, this Court, for sound jurisprudential reasons, will inquire first into the statutory question." (alteration in original) (quoting Harris v. McRae, 448 U.S. 297, 306-07 (1980))). Our determination that Title Nine does not authorize a burden-shift in abuse and neglect cases renders that argument moot.

### VI.

For the reasons expressed, we reverse the judgment of the Appellate Division and remand to the Family Part for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.

31